**RICK P., Appellant,**

v.

**STATE of Alaska, OCS, Appellee.**

**No. S–11461.**

Supreme Court of Alaska.

April 1, 2005.

---

Sharon Barr, Assistant Public Defender, Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Rick P. appeals orders terminating his parental rights over his children Dylan and Diane.[1] The superior court found that Rick shifted households frequently and assaulted his domestic partners, and that this behavior, among other things, caused Dylan mental injury sufficient to support terminating Rick's rights. Rick's main argument on appeal is that his conduct was not necessarily the cause of Dylan's serious emotional problems. We reject this as unsupported by the record. The superior court also found that Rick failed to maintain contact with his daughter Diane for several years, and that this constituted abandonment sufficient to support terminating Rick's rights over her. Rick argues that this was unfair, because for much of Diane's childhood he was unsure whether he was the biological father, and was in prison at other times. But there were periods when Rick was out of prison and he had claimed paternity in a formal custody pleading; we think under these circumstances his failure to maintain contact was abandonment. We therefore affirm the orders terminating Rick's parental rights over both children.

## II. BACKGROUND

Rick did not testify or call any witnesses at trial, and the facts presented below are undisputed except as noted.

### A. Dylan

Dylan was born in January 1995. Rick and Dylan's mother split up soon after Dylan was born; Rick got fifty-one percent custody and the mother got forty-nine percent. In August 1999 the predecessor to the Office of Children's Services (OCS) received a report of harm, to the effect that the mother's husband had sexually abused Dylan. Around this time, OCS also received a report that Rick was leaving Dylan with multiple caregivers (including a friend who had been recently released from jail), that Rick and his girlfriend engaged in domestic violence, and that Dylan was seen "playing in cocaine."

This led OCS to remove Dylan in November 1999 from Rick's custody. He was placed with a foster family. Dylan stayed with this family between approximately November 1999 and August 2001. He initially showed disturbing behavior—choking a cat, killing a pet duck, fondling his foster mother—but over time became better behaved as he settled in with the foster family. During this period Dylan's parents stipulated to an adjudication of Dylan as a child in need of aid under AS 47.10.011(6) (physical harm), (7) (sexual abuse), and (9) (neglect).

Meanwhile, in December 1999, Rick was arrested and ultimately convicted for assaulting his girlfriend. He was incarcerated until April 2000. By the fall of 2000 Rick began participating in his case plan, and married a woman named Leigh B. Leigh had prior convictions for assault. Dylan visited with Rick and Leigh on the weekends, which seemed to go well but also appeared to be correlated with increased misbehavior upon his return to school and the foster home.

By August 2001 Rick had completed all the requirements of his case plan, and Dylan was returned to Rick's home. Rick's case plan had included anger management and psychological assessments by Dr. Paul E. Turner and Dr. Jackie Bock. Prior to Rick's resumption of custody, Dr. Turner found that Rick had significant parenting deficits, particularly vis-a-vis Dylan's problems with sexuality and aggression. In his sessions with Rick, Dr. Turner stressed the importance of providing

1. Pseudonyms have been used to protect the privacy of the parties.

a secure home for Dylan when Rick resumed custody, and keeping track of Dylan's academic program.

Dylan stayed with his father from August 2001 to December 2002, when OCS removed him. This period was characterized by a marked increase in Dylan's anger and sexual misbehavior, including an incident in which Dylan shoved a girl's head into his crotch. Toward the end of this period, Rick began shifting households and domestic partners rapidly. In June 2002 Leigh kicked Rick out and he moved in with another woman, Stella. In November 2002 Rick and Dylan apparently became somewhat vagrant, shifting multiple times between Stella's house and Leigh's house, with a brief stay in the house of a woman Rick claimed was his sister. Domestic violence and absenteeism remained a problem in these households. Leigh got a domestic violence restraining order against Rick, and claimed that Rick was never at home. Stella claimed that she was Dylan's primary caregiver. There were physical fights between Stella and Rick, which Dylan seems to have witnessed. During this period, Dylan attempted to run away to his foster family. Dylan testified (and the superior court found) that Rick slapped Dylan at one point during this period, leaving marks serious enough for a church pastor to call the police to investigate (the investigation did not result in a prosecution, and during the investigation Dylan denied having been slapped, a denial Rick relies on in this appeal to argue that the slap did not in fact in occur). Dylan testified that Rick disciplined him by hitting him with a spatula, by making him eat soap, and by making him drink vinegar.

Participation in counseling also declined during this period: Dylan began missing sessions with Dr. Bock, and Rick missed seven of seventeen home family sessions. Dylan and Rick would return to counseling sporadically in response to specific incidents. Rick then dropped the family out-of-home-based services. Toward the end of the period of Rick's custody over Dylan, in fall 2002, Dr. Turner evaluated Dylan and Rick. He diagnosed Dylan as having "Reactive Attachment Disorder, Major Depression, and Oppositional Defiant features. [Dylan] was also sexually reactive." Dr. Turner concluded that this was caused by Dylan's chaotic, violent home life, and recommended foster care. During this period, Dylan also failed to show up for a remedial summer reading program in which he was enrolled.

Rick's custody ended in December 2002. On December 12 no one picked up Dylan from the school bus stop. The next day OCS removed Dylan from Rick's care. OCS returned Dylan to the foster home where he had been placed before, and Dylan immediately called these foster parents his mom and dad. The foster parents noticed that Dylan was dirty by the time he got to them; he had also been dirty and badly clothed during one of his recent visits to Dr. Bock. Rick visited Dylan until March 2003, when he was convicted of assaulting Stella. Rick was incarcerated from March 2003 to February 2004, a month before the termination trial began. Dylan is doing well with the foster family.

### B. Diane

Diane was born in May 1998. Her father is Rick (though his paternity was not definitively established until much later), and her mother is another woman, not Dylan's mother.

Rick and the mother apparently separated before Diane was born. Rick met Diane for the first time at a birthday party for another child. He took her home to his house for several nights, and unsuccessfully petitioned a court to issue a protective order to save "my child" (his words) from the mother, whom Rick accused of abusing the child. In August 2001 the state developed a case plan that called for Rick to visit Diane to get to know her, but it appears Rick did not sign the case plan and did not attempt to visit Diane. OCS took emergency custody from the mother in October 2001, at which point Rick again unsuccessfully sought custody, even though he also denied paternity. OCS then returned Diane to her mother.

In January 2002 a paternity test confirmed Rick was the father. OCS took custody of Diane for good in August 2002, based on serious neglect and physical abuse by the mother. It appears the first supervised visitation with Rick began five months later in

January 2003. The visits went poorly, with Diane rejecting Rick. The visits lasted less than three months because Rick was incarcerated in March 2003.

These supervised visits in early 2003 appear to be the only contact Rick ever had with Diane, the four-day birthday party interlude aside. According to Rick's attorney, these visits "were, outside of a one-week prior period of time, . . . the only time [Rick] ever got to see his daughter." OCS sent an updated case plan to Rick in prison in January 2004, but he replied by saying OCS should not send him any more forms and should contact his attorney.[2] Rick was released in February 2004, and made no attempt to contact OCS in the month between his release and the termination trial.

### C. Proceedings and Decision of the Superior Court

OCS filed termination petitions in April 2003 (Dylan) and December 2003 (Diane). By stipulation, both children had previously been adjudicated as children in need of aid. In both cases the mothers ultimately did not contest termination of their rights.

Rick's termination trial lasted four days, and was devoted almost exclusively to issues related to Dylan. OCS's witnesses included Dylan, Dr. Bock, Dr. Turner, the foster mother, and OCS case workers. Rick did not testify himself, and did not present any other witnesses.

Superior Court Judge Harold M. Brown issued separate orders terminating Rick's rights to both children. In Dylan's case, the termination was based on a finding of neglect, mental abuse, and physical abuse. In Diane's case, the termination was based on a finding of abandonment and neglect.

## III. DISCUSSION

### A. Statutory Scheme, Claims of Error, Standard of Review

To terminate parental rights, the department must establish by clear and convincing evidence that the child "has been subjected" to one of the eleven conditions enumerated in AS 47.10.011 that establish that a child is a "child in need of aid."[3] As described more below, one of these conditions is where the parent is responsible for a "mental injury" to the child.[4] Another condition occurs where a parent or guardian has "abandoned" the child.[5]

A second relevant prerequisite to termination is a finding (also by clear and convincing evidence) that the parent has either (i) "not remedied the conduct or conditions in the home that place the child at substantial risk of harm," or (ii) "failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[6]

Rick challenges the superior court's order on the ground that both these prerequisites were not properly established with respect to either child—i.e., that there was not clear and convincing evidence that the children were in need of aid, and that he failed to remedy these harmful conduct or conditions.

To the extent Rick's challenges are to the superior court's factual findings, our review is for clear error.[7] Whether particu-

---

2. According to the caseworker who received the note and appeared to read from it at trial, Rick said, "I do not wish to receive any type of forms or letters from you. Please contact me through my [attorney]. . . . I think you and your office has caused me enough stress and abuse by kidnaping my son." According to court papers submitted by Rick's attorney, the case plan covered Diane as well Dylan.

3. AS 47.10.088(a)(1)(A). Where as here the parents have previously stipulated that a child should be adjudicated as being in need of aid, OCS still has the burden of proving in the subsequent termination proceeding that the children

were in need of aid by the "clear and convincing" standard. *See D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 208 (Alaska 2000).

4. AS 47.10.011(8)(A).

5. AS 47.10.011(1).

6. AS 47.10.088(a)(1)(B).

7. *E.g., G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 650–51 (Alaska 2003).

lar facts are sufficient to support termination is a question of law that we review de novo.[8]

## B. Rick's Rights over Dylan Were Properly Terminated.

### 1. The superior court properly found that Dylan was a child in need of aid.

■ The superior court found by clear and convincing evidence that Dylan was a child in need of aid based on its finding that Rick was responsible for mentally injuring Dylan under AS 47.10.011(8). We think this was not erroneous.

Alaska Statute 47.10.011(8) says that a child is in need of aid where, among other things, "conduct by or conditions created by the parent ... have (A) resulted in mental injury to the child." Rick seems to concede that Dylan has suffered the requisite mental injury, manifested by Dylan's aggressive, sexually inappropriate behavior. Instead, Rick's argument is that OCS failed to prove the cause of these injuries. Specifically, Rick argues that the cause could have been the stepfather's early sexual abuse of Dylan, rather than anything that Rick did while he had custody. As proof, Rick notes that Dylan continued to behave badly during Dylan's first placement in a foster home, before he was returned to Rick's care. Rick also cites testimony by Dr. Bock that childhood sexual abuse would usually leave permanent scars. On this basis, Rick argues that the state failed to carry its burden of proving that he caused the mental injury by clear and convincing evidence.

We reject this argument, which is essentially an argument that the superior court's factual findings were clearly erroneous. Judge Brown based his "mental injury" finding on the testimony of Dr. Turner and Dr. Bock, two clinical psychologists who worked with Dylan and Rick over the years. Although Dr. Bock agreed on cross-examination that any victim of sex abuse "may well need periodic counseling," she and Dr. Turner were quite clear that they thought Rick was, at a minimum, a major factor in Dylan's emotional problems. Dr. Bock testified:

Any child, I think, that's involved in [Rick's] home will run into problems with using aggression and violence as a means of problem-solving, they will lack appropriate social skills, they will lack a stable home and safety, they'll lack consistent parenting by a set of parents, they will develop difficulties or continue difficulties with trust, autonomy and security, thus possible atypical attachment patterns. They are likely to have poor physical and sexual boundaries. They are very unlikely to have appropriate adult role models, either male or female, and they will also be exposed to illegal behavior.

They will be exposed, likely, to adult sexuality which is age-inappropriate. They will not have an opportunity to learn appropriate, age-appropriate, social skills, sexual behavior. Thus, their long-term relationships in terms of intimacy and generativity will be impaired.

Similarly, Dr. Turner said it was "extremely important" for Dylan to live in a family free from violence and with a stable set of caregivers. He also said that a "whole lot" of Dylan's emotional disturbance was attributable to the instability and violence in Rick's households:

He wasn't supervised. He was exhibiting behaviors that you see with children who have multiple caregivers. They tend to get real chaotic in their behavior and a little unpredictable. That he had—he has a negative view of women and relationships with women, in part because—because of his father's modeling.

I felt that some of his opposition behavior—I felt a whole lot of his oppositional behavior and the behaviors that were being seen with aggression and sexual activity were what had been modeled for him and there wasn't parenting specific to those specific problems. And I had concerns about [Rick's] ability to do so.

On the basis of this testimony, the superior court found that Dylan's "sexual and aggressive behaviors were believed to be the result of poor role modeling in the home." The superior court also found that Dylan's prob-

8. *Id.*

lems "would increase with poor supervision and monitoring, neglect, changing caregivers, conflict, and change in residence"—these being the central problems with Rick's custody of Dylan. These are findings of fact, and the evidence above shows that they are not clearly erroneous.

The superior court also found that Dylan was a child in need of aid based on other subsections of AS 47.10.011 (such as physical injury), but our determination that the mental injury finding was not erroneous makes it unnecessary to consider Rick's challenges to these other findings.

### 2. Rick failed to remedy the conduct placing Dylan at substantial risk of harm.

■ Judge Brown found that Rick failed to remedy the conduct placing Dylan at substantial risk of harm. This finding was based on "the continued chaos in [Rick's] relationships, repetitive assaultive and sexually inappropriate behaviors, and chronic neglect of the child."

Rick's first challenge to this finding is that he attended various counseling sessions, and that this constitutes a remedy of his conduct. But this argument does not speak to whether he had *succeeded* at controlling his anger, which was the root cause of all the violence and chaos that produced Dylan's mental injuries. The superior court finding cited above shows Judge Brown's view that Rick had not succeeded at controlling his anger. There was sufficient evidence to support this, including Rick's assault of his girlfriend Stella in 2003 after several years of counseling. We believe this behavior is a legally adequate basis to conclude that he had not remedied the conduct that led to Dylan's mental injuries.

Rick's second argument is that things were not so bad for Dylan while he lived with Rick. Specifically, he argues that Dylan was not present during any physical assaults of Rick's spouses, and that he and Dylan lived mainly with only two of Rick's girlfriends. But the discussion in the preceding section establishes that things were bad indeed—i.e., the conditions were sufficient to make Dylan a child in need of aid. Rick's attempt to minimize the conduct that led to the adjudication is not an independent argument about whether he ever remedied that conduct.

We therefore conclude that the superior court did not err in its finding that Rick failed to remedy the conduct that led to Dylan's mental injuries.

### C. Rick's Rights over Diane Were Properly Terminated.

Rick also challenges Judge Brown's findings that Diane was a child in need of aid and that Rick failed to remedy the conduct or conditions that harmed Diane.

### 1. The superior court properly found that Diane was a child in need of aid.

■ Judge Brown found that Diane was a child in need of aid based on abandonment, AS 47.10.011(1), and based on neglect, AS 47.10.011(9). We conclude that Judge Brown did not err in finding that Rick abandoned Diane, which makes it unnecessary to consider Rick's challenges to the neglect finding.

Alaska Statute 47.10.011(1) authorizes an adjudication where "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter." The mother relinquished her parental rights to Diane and seriously neglected her, so the prerequisite related to "the other parent" is met. The remaining requirement is in AS 47.10.013(a), which provides:

> For purposes of this chapter, the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult.

The statute goes on to list certain instances that are also included within the definition of abandonment; among these is where the parent has "without justifiable cause ... made only minimal efforts to support and

communicate with the child."[9] In *G.C. v. State, Department of Health & Social Services, Division of Family & Youth Services,* we interpreted section .013 to impose a two-part test: (1) there must be parental conduct evidencing a "willful disregard" for parental obligations, leading to (2) the destruction of the parent-child relationship.[10] Rick does not challenge the destruction of any parent-child relationship, presumably because of the uncontested evidence that Diane was unfamiliar with Rick and overtly rejected his affection; this contrasted with her attachment to her foster mother and was obviously based at least partially on Rick's absences from her life.

Instead, Rick's arguments focus on whether his conduct evidenced a "willful disregard" for his parental obligations. Judge Brown found that Rick abandoned Diane by failing to maintain contact in the periods before and after the supervised visits of early 2003. But Rick argues that it was unreasonable to expect him to visit or care for Diane during much of this time, because his paternity was not confirmed until January 2002, and because he was incarcerated between March 2003 and February 2004.

We reject Rick's arguments because there is undisputed evidence that he had good reason to believe Diane was his daughter dating back at least to May 2001, well before he went to prison. It was at that time that Rick referred to Diane as "my child" in court papers; he also sought custody on this basis on several occasions before January 2002. This does not show that Rick was *sure* of his paternity before the January 2002 paternity test, but it does indicate he thought his paternity was at least a likely possibility; in fact, OCS thought the likelihood was high enough to give Rick a case plan to visit Diane in August 2001. This means that Rick knew Diane might well be his child, was growing up without him, potentially in the same conditions of neglect that led to his petition for a protective order after the birthday party. Under these circumstances, we think it is fair to say that Rick's failure to visit Diane dur-

ing this period constitutes a "conscious disregard" of parental obligations, and a lack of effort to communicate with Diane "without justifiable cause."[11]

We therefore think Rick's conduct in the period before his incarceration was sufficient to sustain the abandonment finding, but we note that the evidence also shows Rick's "willful disregard" of his parental obligations in the period during and after his prison sentence. Rick failed to contact OCS in the month after he was released from prison in February 2004, and he reacted negatively to OCS's case plan while in prison. Although a parent may insist that OCS communicate through the parent's lawyer, the tone of Rick's response ("I think you and your office has caused me enough stress and abuse by kidnaping my son.") makes it clear that Rick was not interested in participating in the case plan, and by extension, not interested in visiting his daughter.

■ Finally, we reject an argument Rick makes based on AS 47.10.080(*o*). This statute authorizes courts to terminate parental rights where the parent "is scheduled" to be incarcerated for "significant" periods of time and the parent has not provided for any other caregiver. Rick points out that this statute requires findings that were not made here, such as whether Rick's period of incarceration was "significant." But the statute is merely an additional, independent authority OCS may rely on to terminate rights in cases where the parent's incarceration itself is likely to injure the child in the future; it does not supplant AS 47.10.088(a)(1)(A) and 47.10.011(1) (abandonment) as grounds for terminating the rights of a parent who has been previously incarcerated, and who has willfully disregard parental obligations either before, during, or after that incarceration.

Based on the foregoing, we conclude that termination of Rick's rights to Diane was properly based on abandonment under AS 47.10.011(1).

---

**9.** AS 47.10.013(a)(2).

**10.** 67 P.3d 648, 651–52 (Alaska 2003).

**11.** AS 47.10.013(a) & (a)(2).

### 2. Rick failed to remedy his abandonment of Diane.

Judge Brown found that Rick failed to remedy his abandonment of Diane based on "the child's rejection and fear of her father which the child demonstrated during visits." Rick argues that this finding was erroneous, because Diane's rejection of Rick "may well have been based on unrelated problems that had occurred in her mother's household." It is plausible to assume that Diane's abuse at the hands of her mother may have contributed to her distrust of Rick, but it defies common sense to suppose that the rejection was not also based in major part on Rick's absence from her life. For example, Diane seems to have bonded quite well with her foster mother. Rick's argument is speculative, and does not establish that Judge Brown clearly erred in his determination that Rick was to blame for Diane's rejection.

An additional issue, not raised by Rick, is whether Judge Brown's findings constitute a finding that Rick "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury" within the meaning of the failure-to-remedy provision.[12] Specifically, the question is whether Judge Brown's findings establish that reuniting Diane with Rick would place the child at substantial risk of a "mental injury."

Our cases indicate that a parent's willingness to resume parental duties does not "remedy" abandonment if this change of heart comes too late for the parent to bond with the child during the critical early phase of the child's life.[13] In *M.W. v. State, Department of Health & Social Services,* the father said he was ready to resume a role in his daughter's life, and argued that under these circumstances there was no failure to remedy the conduct that put the child at risk of harm.[14] We rejected this argument. We noted expert testimony in the record in that case that it was important for a child to bond with its parent in the "early months" of its life; we also noted legislative findings indicating "the importance of expediting the placement process for children under six years of age."[15] On this basis, we concluded that the "parent's attempt to resolve abandonment by reappearing does not remedy the conduct unless the attempt occurs within a reasonable amount of time."[16]

We believe the assumption underlying this decision is that, where a young child has lived without the parent for a significant period of time, that in and of itself may be sufficient evidence to establish that reunification would put the child at "substantial risk of ... mental injury" within the meaning of AS 47.10.088(a)(1)(B)(ii). Here, there is no expert testimony about the importance of early bonding, but it was clear that Rick spent almost no time with Diane in the five years of her life preceding the termination trial. There was also compelling evidence of Diane's "rejection and fear of her father" during the brief supervised visits that did occur We believe this rejecting behavior indicates the mental injury clearly enough to establish Rick's failure "within a reasonable time" to remedy the conduct that led to Diane's mental injury, even assuming Rick were ready to assume custody or visitation of Diane today. We therefore find no error in Judge Brown's failure-to-remedy finding.

## IV. CONCLUSION

We AFFIRM the judgments of the superior court.

---

12. AS 47.10.088(a)(1)(B)(ii).

13. *See M.W. v. State, Dep't of Health & Soc. Servs.,* 20 P.3d 1141 (Alaska 2001).

14. *Id.* at 1145.

15. *Id.* (footnote omitted).

16. *Id.*