NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LANCE H. | ) | |
| | ) | Supreme Court No. S-14510 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-08-00069 CN |
| v. | ) | |
| | ) | <u>MEMORANDUM OPINION</u> |
| STATE OF ALASKA, | ) | <u>AND JUDGMENT</u>* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1429 – September 5, 2012 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Heath, Judge.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

---

\*      Entered under Appellate Rule 214.

## I.    INTRODUCTION

Simon was born in 1999 to Melissa and Lance.[1]   Lance became Simon's primary caretaker when Simon was two months old and raised Simon for seven years on the East Coast.  When Simon was seven years old, Lance was incarcerated in South Carolina for criminal domestic violence against his girlfriend.  While Lance was incarcerated, Simon was sent to Alaska to visit Melissa, who had a history of drug abuse.  Melissa subsequently refused to send Simon back to South Carolina.  The Alaska Department of Health and Social Services, Office of Children's Services (OCS), took emergency custody of Simon in September 2008 due to concerns about Melissa's ongoing substance abuse and neglect.  Lance was still incarcerated in South Carolina at the time Simon was removed from Melissa's care.  Lance was involved intermittently with Simon's case and attempted to comply with services that would lead to reunification on the East Coast.  He also had telephonic visitation with Simon.  However, he spent significant time incarcerated and moved frequently when not incarcerated.  Eventually Lance moved to Alaska to be closer to Simon, but a termination of parental rights trial was already scheduled.  After the trial commenced, the superior court continued the trial and ordered OCS to provide services to Lance, which it did.  Lance failed to complete his case plan, lost his job, and was convicted of two alcohol-related offenses.  The termination trial resumed and the superior court terminated his parental rights.[2]  We affirm.

---

[1]    Pseudonyms have been used to protect the privacy of the parties.

[2]    Melissa does not appeal the termination of her parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Simon was born in 1999 to Melissa and Lance. They lived on the East Coast. Simon is not an Indian child as defined in the Indian Child Welfare Act, 25 U.S.C. § 1903(4) (2006).

About two months after Simon was born, Lance found Melissa using drugs with a neighbor while taking care of Simon. Lance became upset, got into a fight with the neighbor, and Melissa jumped on his back. He was charged with domestic violence and went to jail for 35 days. Once Lance was released from prison, Melissa left Simon with him, saying she would be back in a couple hours. She did not return. Lance became Simon's primary caretaker and raised Simon for the next seven years. During this time Lance maintained a steady job as a foreman at a construction company.

When Simon was seven years old, Lance was incarcerated in South Carolina for criminal domestic violence against his girlfriend. The details of the assault are not clear, but Lance testified that he and his girlfriend had been drinking at the time. While in prison, Lance's mother, Bonnie, took care of Simon. Lance was released in 2007, but violated his probation a month later by driving with a suspended license and returned to prison to serve the remainder of the assault sentence. Simon returned to Bonnie's home.

Approximately nine months into Lance's incarceration, in late 2007 or early 2008, Melissa contacted Bonnie; Melissa explained that she had gone through rehabilitation and requested that Bonnie send Simon for a visit to Alaska where Melissa resided. After Melissa's father confirmed her rehabilitation, Bonnie sent Simon to Alaska to visit his mother. Melissa subsequently told Bonnie she was not going to send Simon back to South Carolina, and Simon has remained in Alaska ever since.

## B. OCS Involvement and Proceedings

On August 24, 2008, while Lance was still incarcerated, OCS received a report that Melissa was using drugs. The following day OCS went to the home and spoke with Melissa. She denied taking drugs but refused to provide a urine sample for analysis without a warrant. Later that day she did provide a urine sample which was positive for cocaine and benzodiazepines. OCS took emergency custody of Simon on September 10, 2008 due to Melissa's substance abuse and its concerns of neglect.

Lance was still incarcerated in South Carolina at the time Simon was removed from Melissa's care, but he participated telephonically during a pre-trial conference. On January 14, 2009, social worker Kiplynn Moore sent Lance a letter and a questionnaire about his history, which Lance completed and returned. On February 4, 2009, Moore received a letter from Lance explaining his concerns regarding Simon and expressing his desire that Simon be placed with either Bonnie or his father, Lance Sr. Lance also provided OCS with certificates of programs he completed while in prison, including parenting classes and his GED. OCS did not create a case plan for Lance while he was in prison. Lance wrote to Simon from prison, but could not call Simon because he did not have money for phone calls.

Moore followed up with Lance's suggestions for Simon's placement by initiating the Interstate Compact for the Placement of Children (ICPC)[3] process for Bonnie in South Carolina. However, due to concerns regarding Bonnie's financial and mental health, that placement was denied. Moore also started the ICPC process for Lance Sr. in West Virginia but that placement was never completed.

In September 2009 Lance was released early from prison due to good behavior after serving three-and-a-half years of his sentence. Lance Sr. let Lance live

---

[3] *See* AS 47.70.010-.080.

in a home he owned in South Carolina. Lance engaged in telephonic visits with Simon four times a week. The case was reassigned from Moore to another social worker just as Lance was being released from prison. Moore had not explored the possibility of in-person visitation between Lance and Simon before leaving the case.

In the fall of 2009, Lance's new social worker, Fennisha Gardner, spoke with Lance about developing a case plan. They discussed Lance taking anger management and parenting classes, as well as getting a drug assessment. They did not discuss in-person visitation. Lance obtained a job in November 2009. He started anger management classes but was unable to pay the fee of $80-90 per class. Lance eventually found a facility that would accept payment on a sliding scale, but the extent to which he participated in anger management classes is not clear.

In January 2010 social worker Raymond Edwards took over the case. Lance did not receive a copy of the case plan until either February or March 2010. Lance and Edwards were in communication in early February 2010 as Lance worked with South Carolina's Department of Social Services in the hopes of using its reunification services. However, beginning in mid-February and into March, Edwards was unable to contact Lance.

In March 2010 Lance allowed his nephew to move into his house on a temporary basis. Allegedly unbeknownst to Lance, his nephew was selling drugs, mainly Ecstasy. On March 25 Lance asked his nephew for a ride, and while Lance was in the car, his nephew stopped at the mall to see a friend. As he waited, Lance began panhandling for gas money and was arrested for aggravated solicitation. Meanwhile, his nephew was arrested at the mall for selling drugs. Officers subsequently discovered drugs in Lance's home, and Lance was charged with trafficking, manufacturing, and distributing, but these charges were dismissed in June 2010. Lance had been in jail for 125 days and was unable to participate in any services while incarcerated.

Edwards did not know where Lance was from mid-February to May 2010. Edwards filed a petition for termination of parental rights for both Melissa and Lance in March 2010. Lance resumed contact with OCS in July 2010. Because of his time in jail, Lance lost his previous housing and employment. Lance moved in with his mother, obtained employment, and later moved into an apartment provided by his employer. After a few months, he moved to West Virginia to stay with his father and his stepmother. While in West Virginia he participated in a substance abuse assessment, but failed to sign a release of information, so Edwards was unable to follow up with the assessor. After he and his father had an altercation, he returned to South Carolina and moved in with his employer for a second time. During these frequent moves OCS lost contact with Lance for about a month.

In August 2010 Lance resumed contact with OCS and requested that the ICPC process be initiated again for his father and separately for himself. However, Lance Sr. and his wife eventually decided that they would not be able to care for Simon. Edwards explained OCS would not begin the ICPC process for Lance until he made progress on his case plan, obtained steady employment, and stayed out of legal trouble. Edwards testified that he would be unable to work with South Carolina social services without an ICPC agreement in place for Lance. OCS had changed the goal for Simon from reunification to adoption in September 2009, and the termination trial was set to begin in January 2011.

OCS paid for Lance to travel to Alaska to visit Simon for three days in late September to early October 2010. This was the first in-person visit since Simon went into OCS custody in September 2008, and Lance testified that the visit went well. During this trip Lance also met Edwards in person. Edwards discussed a wide range of issues with Lance including options of reunification, relinquishment of parental rights,

the termination trial, the fact that OCS's goal for Simon was adoption, and Lance's case plan.

Lance returned to South Carolina in early October. On October 31, 2010, Lance was arrested for public intoxication and destruction of property. He pleaded guilty to public intoxication and served a brief time in jail.

On December 13, 2010, Lance moved to Alaska. He wanted to eliminate the confusion and miscommunication caused by his being outside of Alaska. His attorney at the time and Edwards did not think it was a good idea because Lance lacked resources and support in Alaska, but Lance decided to move anyway. Lance and Edwards met shortly after Lance arrived in Alaska. Lance provided a urine sample for testing, which was negative. Lance asked Edwards to refer him to anger management classes, but no services were scheduled by the time of the termination trial. Lance also asked Edwards to schedule another substance abuse assessment, but Edwards refused since the termination trial was beginning soon and he believed he was not required to provide services to Lance once the termination petition had been filed. The only service in place at the time of the commencement of the termination trial in January 2011 was visitation with Simon, which Lance participated in consistently.

Simon had been moved to three different foster care placements in the two-and-a-half month period before the trial. Just before the beginning of trial, OCS identified Simon's current placement as a potential permanent placement.

## C. The Termination Of Parental Rights Trial Is Continued

During the second day of trial Superior Court Judge Gregory Heath decided to stop taking evidence and continued the trial for sixty to ninety days. Judge Heath explained that "reasonable efforts never end[]" and he was concerned with OCS's interpretation to the contrary. The court stated, "[T]he father . . . has been willing since he moved up here in December to start treatment. . . . And I'm going to give him an

opportunity to at least begin that." Judge Heath characterized this case as "unique" and said, "I need to see . . . if he's even willing to even make an effort." The court ordered OCS to refer Lance to domestic violence intervention programs and for alcohol treatment.

OCS made referrals for domestic violence treatment, a substance abuse assessment, and urine analysis testing. Lance's urine analysis tests were all clean. Edwards referred Lance to Clitheroe Center for a substance abuse assessment. Instead, Lance went to Insight Therapy where it was recommended that Lance participate in a ten-week outpatient treatment program. Edwards thought Lance was "assessment shopping" when he got another assessment from Nauska Couseling in March 2011, but OCS accepted the assessment because the center was in the same building as Lance's anger management classes. The assessor concluded that Lance met "the criteria for alcohol abuse" and recommended Alcohol/Drug Information School and outpatient counseling. Lance completed a 12-hour course offered through the Alcohol/Drug Information School at Set Free Alaska. He also participated in four counseling sessions at Nauska Counseling.

On May 19 Lance was fired from his job after arriving late and failing to show up for work on four prior occasions. He notified Nauska Counseling that he had been fired but did not tell Edwards. That night Lance was arrested for driving under the influence and had a breath alcohol content (BrAC) of .190. He was convicted of this offense. Later that week Lance contacted Nauska Counseling to report his arrest but downplayed his level of intoxication, stating that his BrAC was only .085. He returned to Nauska Counseling for therapy on June 2, but by mid-June was missing appointments. Lance was discharged from Nauska Counseling for non-compliance. Lance also never completed his domestic violence program.

Before learning about Lance's DUI and believing he was attending his sessions, OCS considered increasing Lance's visitation and initiating a trial home visit. OCS requested that the termination trial be continued for another six months in order to allow Edwards to monitor Lance's participation in services for a longer period. The court granted this request and the May 2011 continued trial date was vacated. However, after learning Lance lost his job and had gotten a DUI, OCS asked the court to reschedule the termination trial. OCS provided Lance with an updated case plan which essentially required him to restart all services.

On July 25, 2011, Lance was again arrested for driving while intoxicated. He refused to provide a breath sample stating he did not want to be "screwed again." He was also charged with improper use of evidence of registration and failure to wear a seat belt. He was convicted of refusal to participate in a chemical test and served 25 days in jail. He was released about a week before the termination trial recommenced on August 25, 2011.

At the continued termination trial, Edwards explained that the problem was that "it's constantly up and down" because Lance would do well for a period of time and then "everything just implodes and he ends up in some kind of legal difficulty, in jail, [or] unemployed." Lance testified that he would like six more months to demonstrate that he could achieve stability and show that he could take care of Simon.

On September 30, 2011, the superior court issued an order terminating both Melissa's and Lance's parental rights to Simon. The court found Simon was a child in need of aid pursuant to AS 47.10.011(1) and (10).[4] The order stated:

---

[4]     Alaska Statute 47.10.011 states:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the

(continued...)

6. . . . [Simon] has been abandoned by . . . both parents' inability to complete a case plan designed to effectuate reunification. Both parents have substance abuse issues that have yet to be treated.

7. There is clear and convincing evidence that the parents have not remedied the conduct or conditions in the home that put the child at substantial risk of harm, or failed to do so in a reasonable time. These findings are based on the following evidence: . . . [Lance] has been given several chances to make necessary changes in his life to provide [Simon] with a safe and stable home. [Lance] has not been able to do this. . . .

8. There is clear and convincing evidence that reasonable efforts were made to provide family support services to the

---

[4] (...continued)

evidence that the child has been subjected to any of the following:

(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;

. . . .

(10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child; if a court has previously found that a child is a child in need of aid under this paragraph, the resumption of use of an intoxicant by a parent, guardian, or custodian within one year after rehabilitation is prima facie evidence that the ability to parent is substantially impaired and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child as described in this paragraph.

child and to the parents to prevent out-of-home placement of the child or to enable the safe return of the child to the family.

. . . .

10. The best interests of the child will be promoted by terminating . . . [Lance's] parental rights. . . . [Lance has] not been able to maintain [a] safe and stable home[] for [Simon]. [Simon] has special needs and requires a high level of parenting skills on a daily basis. He has been diagnosed with PTSD [post-traumatic stress disorder], ADHD [attention deficit hyperactivity disorder], ODD [oppositional defiant disorder] and attends weekly therapy, individual and group sessions. He also remains on medication and has an Individual Education Plan with the school for behavior and academic issues at school.

Lance appeals.

## III. STANDARD OF REVIEW

In a termination of parental rights appeal, we review the superior court's factual findings for clear error and its legal conclusions de novo.[5] "Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with 'a definite and firm conviction that a mistake has been made.' "[6] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[7]

---

[5] *Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 243 P.3d 217, 223 (Alaska 2010).

[6] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[7] *Id.*

Whether the superior court's factual findings meet the requirements of the CINA statutes and rules is a question of law reviewed de novo.[8] When interpreting CINA statutes and rules, we apply our independent judgment, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

## IV. DISCUSSION

In order to terminate parental rights under AS 47.10.088, the superior court must find, by clear and convincing evidence, that: (1) the child has been subjected to conduct or conditions described in AS 47.10.011; (2) the parent has not remedied the harmful conduct or conditions in the home or has failed to remedy the conduct or conditions in the home that place the child in substantial risk within a reasonable time so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and (3) OCS has made reasonable efforts to provide services to the family to facilitate reunification.[10] The court must also find, by a preponderance of the evidence, that termination of parental rights is in the child's best interests.[11]

### A. The Superior Court Did Not Err In Determining That Simon Was A Child In Need Of Aid Pursuant To AS 47.10.011(1).

The superior court found Simon was a child in need of aid pursuant to AS 47.10.011(1) and (10). Its order stated, "[Simon] has been abandoned by . . . both parents' inability to complete a case plan designed to effectuate reunification. Both parents have substance abuse issues that have yet to be treated." Alaska

---

[8]    *Id.*

[9]    *Danielle A. v. State, Dep't. of Health & Soc. Servs., Office of Children's Servs.*, 215 P.3d 349, 353 (Alaska 2009) (quoting *Brynna B.*, 88 P.3d at 529).

[10]    AS 47.10.088; CINA Rule 18(c).

[11]    AS 47.10.088(c); CINA Rule 18(c)(3).

Statute 47.10.011(1) pertains to abandonment while AS 47.10.011(10) pertains to the impairment of a parent's ability to parent due to substance abuse.[12] We review the superior court's factual determinations regarding whether OCS met its burden of demonstrating a child is in need of aid for clear error.[13]

Abandonment is one of the grounds upon which the superior court may base a finding that a child is in need of aid.[14] Alaska Statute 47.10.013(a) states:

> [T]he court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult. Abandonment of a child *also* includes instances when the parent or guardian, without justifiable cause
>
> . . . .
>
> (4)    failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child. . . .

---

[12]    Under AS 47.10.011(10), the superior court may find that a child is in need of aid if the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." The State concedes that while the superior court made findings that Lance has "issues with alcohol, it is not clear from the order whether the court considered whether such alcohol abuse 'resulted in substantial risk of harm' " to Simon. Because we affirm the superior court's finding that Simon was abandoned under AS 47.10.011(1), we need not reach the issue of whether Lance's alcohol use made Simon a child in need of aid under AS 47.10.011(10), although it is clear Lance has a longstanding and recent history of unremedied alcohol abuse that if left untreated would place Simon at substantial risk of harm.

[13]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[14]    AS 47.10.011(1).

(Emphasis added.) The superior court's order stated, "[Simon] has been abandoned by . . . both parents' inability to complete a case plan designed to effectuate reunification." The court thus found Lance had abandoned Simon under AS 47.10.013(a)(4). Regarding AS 47.10.013(a)(4) we have stated, "[W]hile this statutory provision does not necessarily require a parent to follow his or her reunification plan to the letter, it does require more than minimal participation."[15]

We have articulated a two-part test for reviewing cases of abandonment: "(1) [t]here must be parental conduct evidencing a 'willful disregard' for parental obligations, leading to (2) the destruction of the parent-child relationship."[16] We apply "an objective test to see if actions demonstrate a willful disregard of parental responsibility."[17] "A showing of willful disregard under the first prong is not effectively refuted by evidence of the parent's subjective intent or wishful thoughts and hopes for the child nor by token efforts to communicate with the child."[18] Instead, a parent must show "continuing interest in the child" and make "a genuine effort to maintain communication and association."[19] "The second prong is satisfied if there is a causal connection between the parent's conduct and the destruction of the relationship."[20] "[I]t is indicative of a breakdown of the parent-child relationship if the child's best interests

---

[15] *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 951 (Alaska 2000).

[16] *Sean B. v. State, Dep't of Health and Soc. Servs.*, 251 P.3d 330, 335 (Alaska 2011) (internal quotation marks omitted).

[17] *Id.* at 335-36 (internal quotation marks omitted).

[18] *Id.* at 336 (internal quotation marks omitted).

[19] *Jeff A.C., Jr. v. State*, 117 P.3d 697, 704 (Alaska 2005).

[20] *Sean B.*, 251 P.3d at 335-36.

are promoted by legal severance of the relation."[21]  Here, both prongs have been satisfied.

While the superior court did not make an explicit finding that Lance's actions amount to willful disregard of his parental responsibility under the first prong, there is evidence in the record to support the superior court's implicit finding that Lance wilfully disregarded his parental responsibilities.[22]  Lance demonstrated a willful disregard of his parental responsibilities after the superior court continued the termination trial to give him a last-chance opportunity to work on his case plan.  Judge Heath said, "[T]he father . . . has been willing since he moved up here in December to start treatment. . . . And I'm going to give him an opportunity to at least begin that."  Judge Heath stated, "I need to see . . . if he's even willing to even make an effort."  The court ordered OCS to refer Lance to a domestic violence intervention program that he needed to "begin . . . right away" and to alcohol treatment.

But Lance failed to demonstrate that he was "willing to . . . make an effort" on his case plan after the court afforded him this opportunity.  Instead, Lance lost his job, was discharged from counseling for non-compliance, was arrested twice for driving while intoxicated, and failed to communicate these setbacks to OCS.  Lance was fired from his job after showing up late and failing to show up for work on four prior occasions.  Although he disclosed this to his counseling program, he did not notify Edwards.  On the night he was fired, Lance was arrested for driving under the influence with a BrAC of .190 and was later convicted of this offense.  Lance contacted Nauska

---

[21]  *D.K. v. State, Dep't of Health & Soc. Servs.* (*Matter of H.C.*), 956 P.2d 477, 483 (Alaska 1998).

[22]  We remind the trial bench of the importance of making adequate findings. Here, the court's findings are thin, but there is enough evidence in the record to support its conclusions to terminate Lance's parental rights.

Counseling to report his arrest but downplayed his level of intoxication. He was soon discharged from Nauska Counseling for non-compliance after missing several sessions. Lance also did not complete his domestic violence program. Lance was again arrested for driving while intoxicated and he refused to provide a breath sample. He was convicted of refusal to participate in a chemical test and served 25 days in jail. Knowing that the court had provided Lance additional time to comply with his case plan and demonstrate his desire to reunite with Simon, Lance's actions amount to a willful disregard of his parental responsibility.[23]

The second prong also has been satisfied. There is a causal connection between Lance's conduct and the breakdown of the parent-child relationship: Lance's failure to follow through on any part of his case plan in the eight months after the continuance of the termination trial led the superior court to conclude that termination of Lance's parental rights was in Simon's best interests.[24] We acknowledge that Lance consistently participated in visitation with Simon, but Simon's best interests are "promoted by legal severance of the relation."[25] When the termination trial resumed, Lance testified that he would need at least six more months to achieve stability and demonstrate that he could take care of Simon. But at that point Simon had already been in OCS custody for nearly three years. Simon's need for permanence and stability is a

---

[23]    *See Sean B.*, 251 P.3d at 335-36; *see also Hugh P. v. State, Dep't of Health & Social Servs.*, Mem. Op. & J. No. 1230, 2005 WL 3131225, at *5-6 (Alaska, Nov. 23, 2005) ("[The father] showed a clear pattern of failure to follow the various case plans. . . . The overall behavior of [the father], including his acts of disorderly conduct, resisting arrest, assault, and misconduct involving a controlled substance in April 2004, also interfered with the process envisioned by the plans. The finding of abandonment for failure to follow the case plans was not clearly erroneous.").

[24]    *See Sean B.*, 251 P.3d at 336.

[25]    *Matter of H.C.*, 956 P.2d at 483.

paramount concern, and Lance's actions highlighted his inability to serve in a parental capacity.[26] The superior court did not err in determining that Simon was a child in need of aid because his father had abandoned him.

**B.  The Superior Court Did Not Err In Finding That Lance Failed To Remedy His Abandonment Of Simon Within A Reasonable Time.**

In order to terminate parental rights, the superior court must find, by clear and convincing evidence, that the parent has not remedied the conduct or conditions that placed the child in substantial risk of harm or failed, within a reasonable time, to remedy such conduct or conditions.[27] In making this determination, the court may consider any fact relating to the best interests of the child, including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[28]

" 'Reasonable time' means a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and

---

[26]  *See Kent V. v. State, Dep't of Health & Soc. Servs.*, 233 P.3d 597, 603 (Alaska 2010); *see also infra* note 31.

[27]  AS 47.10.088(a)(2).

[28]  AS 47.10.088(b).

ability to form and maintain lasting attachments[.]"[29]  The "reasonableness" of time to remedy the conduct will vary and is considered on a case-by-case basis with relevant factors being the child's needs, the child's age, and the parent's lack of progress.[30]

The superior court concluded that "[t]here is clear and convincing evidence that [Lance has] not remedied the conduct or conditions in the home that put the child at substantial risk of harm, or failed to do so in a reasonable time."  The court relied on evidence of Lance being fired from his job and discharged from Nauska Counseling as well as Lance's failure to complete domestic violence courses and mental health services.

Lance argues that OCS did not give him sufficient time to remedy his conduct.  He also argues that OCS did not give him a case plan until early 2010 and failed to provide him with services after the termination petition had been filed.  It is true that OCS did not provide Lance with meaningful assistance until the court ordered OCS to do so in January 2011.  Lance contends that the court should have taken into account that Lance was on the East Coast, some of his incarcerations were for charges that were dismissed, and that OCS "unreasonably delayed" providing services to him.

OCS counters that it provided services after Lance moved to Alaska, but Lance did not comply for long.  OCS notes that given Lance's "clear pattern" of being unable to remain employed and being jailed for alcohol-related offenses, there was no reasonable basis for believing that an additional six months would have made a difference.

After the superior court continued the termination trial, Lance was given eight months, from January to August 2011, to demonstrate that he was making all

---

[29]  AS 47.10.990(28).

[30]  *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1106-07 (Alaska 2011).

necessary efforts to comply with his case plan and reunite with his son. Apart from consistent visits with Simon, Lance failed to make meaningful progress on his case plan and even had to restart the plan after he was convicted of two alcohol-related offenses. Based on this evidence, the superior court did not err when it found that Lance failed to remedy his abandonment of Simon within a reasonable time.[31]

The dissent states that the court has conflated the failure to remedy requirement under AS 47.10.088(b) with abandonment for failure to participate in a case plan without justifiable cause under AS 47.10.013(a)(4). While this may be a valid concern under a different set of facts, this argument is not apposite here. The superior court continued the termination proceedings for eight months specifically to afford Lance the opportunity to show, as the superior court stated, "if he's even willing to even make

---

[31] It is evident that even had Lance complied with his case plan in the eight months between continuation in January 2011 and recommencement in August 2011 of the termination trial, compliance alone would not establish that he had remedied the conditions making Simon a child in need of aid. *See, e.g.*, *Jena H. v. State Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1211, 2005 WL 1060549, at \*3 (Alaska, May 4, 2005) ("Although [the father] made some attempts to comply with his case plans, the record supports that the superior court did not err in finding that the risks to [the child] were ongoing and had not been remedied."); *Mary E. v. State Dep't of Health & Social Servs.*, Mem. Op. & J. 1151, 2003 WL 22994469, at \*11 (Alaska, Dec. 17, 2003) ("While [the mother] may have made some positive changes in her life, she still had not succeeded in remedying the condition that placed her children most at harm . . . ."). Lance also would have had to demonstrate some substantial period of alcohol-free, violence-free behavior while maintaining consistent employment before OCS could reasonably consider returning Simon to his care and custody. *See Sherry R. v. State, Dep't. of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 902-03 (Alaska 2003) ("Unfortunately, even though [the mother] may have made strides towards remedying her conduct, the trial court could properly find that [she] failed to address her substance abuse problem within a reasonable time."). As previously stated, Simon already had been out of his home for three years, and his need for permanency outweighed Lance's desire for more time to successfully complete his case plan.

an effort." Lance was placed on explicit notice that the time after the continuance of the termination trial was his opportunity to show the court he was serious about addressing the issues in his case plan. Instead of taking advantage of this opportunity to demonstrate his commitment to reuniting with Simon by working on his case plan, Lance was discharged from counseling for non-compliance, failed to complete domestic violence courses and mental health services, lost his job, and was arrested two times for driving while intoxicated. Such actions, in light of the purpose of the superior court's continuance of the termination trial, supports the finding that Lance abandoned Simon by failing to complete his case plan. This evidence also supports the finding that Lance did not remedy his conduct that made Simon a child in need of aid.

## C. The Superior Court Did Not Err In Concluding That OCS Made Reasonable Efforts To Reunify The Family.

Before terminating parental rights, the superior court must find by clear and convincing evidence that OCS made reasonable efforts to provide services to the family for the purpose of reunification.[32] The court may consider all of the services the State provided over the course of the family's involvement with OCS.[33]

The superior court's order terminating Lance's parental rights discussed OCS's efforts to provide referrals for substance abuse assessment and treatment as well as providing Lance with airfare, transportation, and lodging so that he could visit with Simon in September 2010. The court noted that Lance's frequent moves made it difficult for OCS to maintain contact with him.

---

[32] AS 47.10.086; *Sean B. v. State, Dep't of Health & Soc. Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[33] *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

Lance argues that OCS did not provide reasonable efforts to him for over two years, which impacted the services he received. Lance also argues that OCS failed to take his financial situation into account and did not offer to financially assist Lance so that he could comply with the case plan. OCS counters that beginning when Lance was first incarcerated in 2008-2009, OCS social workers worked with Lance on services and visitation.

It is troubling that OCS failed to provide Lance with a case plan until fifteen months after Simon was taken into OCS's custody and that Edwards did not provide services after the initial petition to terminate parental rights was filed. Just because OCS files a petition to terminate a parent's parental rights does not relieve OCS from its obligation to make reasonable efforts.[34] The superior court correctly recognized that reasonable efforts may not have been made up through the date of the commencement of the termination trial. However, the court continued the trial for several months and required OCS to make reasonable efforts and give Lance an opportunity to successfully work on his case plan. The court ordered OCS to refer Lance to domestic violence intervention programs and alcohol treatment, which OCS immediately did.

---

[34] *See* AS 47.10.086(e) ("The department *may* develop and implement an alternative permanency plan for the child while the department is also making reasonable efforts to return the child to the child's family under (a) of this section.") (emphasis added); *see also* AS 47.10.086(b) ("If *the court* makes a finding at a hearing conducted under AS 47.10.080(l) that a parent or guardian has not sufficiently remedied the parent's or guardian's conduct or the conditions in the home despite reasonable efforts made by the department in accordance with this section, *the court* may conclude that continuation of reasonable efforts of the type described in (a) of this section are not in the best interests of the child. The department shall then make reasonable efforts to place the child in a timely manner in accordance with the permanent plan and to complete whatever steps are necessary to finalize the permanent placement of the child.") (emphasis added).

This case is similar to *Frank E. v. State, Department of Health & Social Services, Division of Family & Youth Services*, in which we stated,"[B]y providing a reasonable opportunity for [the father] to remedy the behavior that caused his children to be in need of aid, the continuance cured the [S]tate's attempt to terminate [the father's] parental rights without providing him with the reasonable efforts to reunify him and his children mandated by AS 47.10.086(a)."[35] We conclude that even if OCS's actions were lacking up to the time of the commencement of the termination trial, OCS met the standard for reasonable efforts after the trial was continued. The superior court did not err in concluding that OCS made reasonable efforts.

## D. The Superior Court Did Not Err In Finding That It Was In Simon's Best Interests For Lance's Parental Rights To Be Terminated.

Under AS 47.10.088(c) and CINA Rule 18(c)(3), "[b]efore the court may terminate parental rights, [OCS] must prove . . . by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[36] "[A] child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[37]

The superior court found that it was in the best interests of Simon that Lance's parental rights be terminated. The court stated that Lance has "not been able to maintain [a] safe and stable home[] for [Simon]." The court also considered Simon's special needs including his need for a "high level of parenting skills on a daily basis."

Lance argues that the superior court erred because he and Simon have a

---

[35]     77 P.3d 715, 720 (Alaska 2003).

[36]     CINA Rule 18(c)(3).

[37]     *Kent V. v. State, Dep't of Health & Soc. Servs.*, 233 P.3d 597, 603 (Alaska 2010).

"firm connection" and Simon expressed distress at the thought of his father's parental rights being terminated. Lance points to the case *Karrie B. ex rel. Reep v. Catherine J.* for the proposition that "signs indicating improvement [are] germane to a decision that it [is] in the child's best interests not to terminate parental rights."[38] But Lance did not provide the superior court with indications of improvement. To the contrary, as OCS points out, Lance was still making "bad decisions, resulting in a very unstable life," including losing his job because of missed work, being discharged from counseling for failure to participate, not completing his domestic violence program, and being convicted of two alcohol-related offenses, all after knowing his termination trial was continued specifically so that he could demonstrate his commitment to being reunited with his son.

There is also no question that Simon has special needs and requires a high level of parenting, stability, and permanency. Simon was diagnosed with ADHD, PTSD, and ODD. When the termination trial resumed, Edwards testified that Simon was finally stabilizing and doing well. Edwards also testified that Simon needed permanency as soon as possible, and Lance admitted he would need at least another six months to get his life together.

Based on these facts, it was not clear error for the superior court to determine that it was in Simon's best interests for Lance's parental rights to be terminated.

V.     **CONCLUSION**

We AFFIRM the termination of Lance's parental rights.

---

[38]     181 P.3d 177, 186 n.29 (Alaska 2008).

WINFREE, Justice, dissenting.

I respectfully disagree with this court's decision affirming the superior court's finding that Lance abandoned Simon. I would reverse the superior court's decision terminating Lance's parental rights.

The superior court found Simon was a child in need of aid under AS 47.10.011(1)[1] because he had been abandoned. Under AS 47.10.013(a)(4), abandonment of a child includes instances in which the parent, without justifiable cause, "failed to participate in a suitable plan or program designed to reunite the parent . . . with the child."

We have articulated a two-part test to review abandonment cases: "(1) there must be parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship."[2] To determine whether actions demonstrate a willful disregard for parental responsibility, we apply an objective test and do not look to the parent's "subjective intent or wishful thoughts and hopes for the child."[3] "Rather, a parent must show continuing interest in the child and make a genuine effort to maintain communication and association."[4]

---

[1]  AS 47.10.011(1) provides that "the court may find a child to be a child in need of aid if it finds . . . [that] a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter."

[2]  *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (internal editing and quotation marks omitted) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)).

[3]  *Id.* at 335-36 (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 704 (Alaska 2005)).

[4]  *Id.* at 336 (internal quotation marks and editing omitted) (quoting *Jeff A.C.,*
(continued...)

The superior court's abandonment finding as to Lance fails as a matter of law.[5] The superior court found only that Lance was unable to complete his case plan. The superior court did not find that Lance failed to participate in a case plan;[6] and the superior court not only failed to make a willfulness finding, it failed even to mention willfulness. I cannot join in this court's conjecture of an "implicit" finding of willful failure to participate in a case plan, nor in this court's conclusion that this "implicit" finding is not clearly erroneous. I can agree, as the superior court actually found, that Lance was unable to complete his case plan — but failure to *complete* a case plan is neither "failure to *participate*" in a case plan nor willful disregard of parental responsibility. Otherwise, any parent who fails to complete a case plan for reunification with a child — generally evidence supporting the necessary finding of failure to remedy conditions that placed the child at risk of harm — will as a matter of law also abandon the child.

---

[4]    (...continued)
*Jr.*, 117 P.3d at 704).

[5]    *See Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) ("Whether the superior court's findings satisfy statutory requirements and the Child in Need of Aid (CINA) Rules is a question of law that we review de novo." (footnote omitted)).

[6]    The record reflects that Lance participated in his case plan. After Lance moved to Alaska, he provided several clean urine samples. He received a substance abuse assessment, which recommended that Lance participate in an outpatient treatment program. Lance also participated in counseling and completed an alcohol and drug information course.

In my view there is a difference between a parent who *refuses* to participate in a case plan[7] and a parent who for whatever reasons, including addiction[8] or incarceration,[9] is *unable* to complete a case plan. OCS's remedial efforts must begin with identifying the problem that caused the child to be in need of aid, and then OCS must construct a case plan determining which efforts are reasonable in light of the surrounding circumstances.[10] The parent who refuses to participate in the case plan may rightfully be found to have abandoned the child; the parent who is unable to complete a case plan may not. I do not think the legislature intended the failure-to-remedy requirement (under AS 47.10.088(a)(2)) to become a shorthand for abandonment and an excuse to terminate parental rights without regard to whether a child is otherwise in need of aid.

---

[7]      *See, e.g.*, *Rick P.*, 109 P.3d at 957 (affirming abandonment finding based on father's pre-incarceration activities, but noting that father's actions during and after incarceration also demonstrated " 'willful disregard' of his parental obligations," pointing specifically to father's negative reaction to OCS's case plan while in prison and the "tone of [his] response ('I think you and your office has caused me enough stress and abuse by kidnapping my son')" as evidence that he was "not interested in participating in the case plan, and by extension, not interested in visiting his daughter").

[8]      Immediately after stating that the child had been abandoned because of Lance's "inability to complete a case plan," the superior court stated that Lance had "substance abuse issues that have yet to be treated."

[9]      *See Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 470 (Alaska 2012) (Winfree, J., dissenting) ("[S]omething beyond incarceration is required for abandonment under AS 47.10.011(1) . . . .").

[10]      *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010) (citing *Burke v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007)).

For these reasons, I disagree with this court and would reverse the superior court's termination of Lance's parental rights.