*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOY B., | ) | |
| | ) | Supreme Court No. S-16152 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-14-00082/83 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7131 – October 26, 2016 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices.

STOWERS, Chief Justice.

## I.    INTRODUCTION

A mother and her eight children were routinely and severely abused by the father of the younger children while living in another state. The mother fled to Alaska with four of her daughters in 2013. The family's life remained chaotic and sometimes

violent, with frequent altercations in the home, and the daughters were often out of control. After the Office of Children's Services (OCS) obtained temporary custody of the children, the mother resisted OCS's efforts to reunify the family and refused to participate in supervised visits with her daughters. She left Alaska in October 2014, maintaining only sporadic contact with her daughters, and she has not returned.

After a trial was held, the superior court terminated the mother's and father's parental rights with respect to the younger two daughters, finding that the children were in need of aid due to abandonment and other statutory factors, that the parents had not remedied the conduct that made the children in need of aid, that OCS had made reasonable efforts toward reunification, and that termination was in the daughters' best interests. The mother appeals the termination of her parental rights but does not appeal the superior court's finding that her children were initially in need of aid. We affirm.

## II.    FACTS AND PROCEEDINGS

### A.    History Of Extreme Domestic Violence Committed By Drake In Ohio

Joy B.[1] was married to and lived with Drake B. in Ohio for over 20 years. During this time Joy and Drake had two sons and four daughters together. Joy also had at least two daughters from a previous relationship, who lived with the family for part of this time period. The parties to this case do not dispute the basic facts regarding the family's history while Joy and the children were living with Drake in Ohio.

Drake routinely committed extreme torture and abuse against Joy and the children. For instance, Drake repeatedly used stun guns on the children. On one occasion Drake had to resuscitate one of the sons after he became unconscious from being shocked with a stun gun. Drake would also strip the children's clothes off and

---

[1]    Pseudonyms have been used to protect the privacy of the parties.

whip the children with ropes and extension cords, after rubbing them with oil to minimize scarring from the abuse. Drake would lock the children in their rooms or in confined spaces such as large cardboard boxes for up to a day at a time, with limited food and water, as a form of punishment. There was at least one instance when Joy tried to intervene to protect the children, when Drake had hung one of the sons up behind a door, but Drake threatened to make the situation "worse" if Joy did anything to protect the son. Drake also abused animals in front of the children.

Drake regularly abused Joy, and the children witnessed much of this domestic violence. In addition to routine physical fighting between Drake and Joy, Drake engaged in extreme torture on several occasions. On one occasion, while Joy was pregnant, Drake handcuffed her in her room and starved her until she had a miscarriage. On another occasion, Joy was beaten severely in her room while the children were locked in another room listening to their parents' screams. Once the children were released, they witnessed Drake pouring lighter fluid on Joy and threatening to light her on fire. After the incident, one of the sons attempted to help Joy by bringing her pain relievers, and the father pulled and pinched his ears and threatened to kill him.

Drake also taught the children to berate Joy and to treat her in the same way that he treated her. During some of this time, Drake was engaged sexually with Billie, one of Joy's daughters from a previous relationship. At times Billie appeared to act as the lead female in the household, and she sometimes helped Drake abuse Joy and the other children.

Another one of Joy's daughters from a previous relationship, Tanya, also lived with the family for a time. When she was 11, Tanya reported to Ohio Child Protective Services that Drake had raped her. Child Protective Services removed Tanya from the home, and Joy relinquished her parental rights to Tanya. For the children who remained in the home, Tanya's removal was used as a cautionary example of what would

happen if the children reported any of the abuse they were experiencing; the children were admonished not to break up the family by speaking to anyone about their abuse. Drake also expressly threatened to kill the children if they talked to Child Protective Services, and the children would hide when Child Protective Services came to the house. The children were forced into isolation in other ways as well: they were home-schooled, and they were not allowed to go anywhere or have friends outside the family.

To protect her children from Drake's continuing abuse, Joy fled to Alaska in October 2013 with four of her daughters, Abby (age 16 at the time), Amy (age 14), Alyse (age 10), and Arianna (age 8). Joy left her two sons with Drake because she believed they were "too far gone" and had been trained to abuse her in the same way that Drake did.

**B.    Continued "Chaos" At Joy's Home In Alaska**

The girls' lives improved once they arrived in Alaska, as they were no longer subjected to Drake's extreme physical abuse. Joy housed, fed, and clothed the girls. Yet their home life continued to be chaotic, with verbal and physical fights between some of the girls and Joy. And both Joy and her daughters experienced significant emotional and psychological challenges, including post-traumatic stress disorder (PTSD) and severe emotional disturbance, as a result of the trauma they had experienced.

Testimony in the record indicated that there was general "chaos in the home" during this time, including "arguments [that] would . . . end in physical altercations." The children would sometimes "manhandle" their mother, and Joy acknowledged that they were out of control, especially the older two. The children apparently did not respond to Joy as an authority figure. The Anchorage Police Department was called to respond to altercations in the home on several occasions. In one of these, Amy was arrested for assaulting Alyse and was taken to a Division of

Juvenile Justice facility for a time. Abby also reported that Joy grabbed and slapped her three or four times, generally in the presence of the younger girls.

Although most of the reports of physical fighting involved the older two girls, Alyse and Arianna also struggled and exhibited disturbing behaviors. Testimony indicated that Alyse and Arianna sometimes watched pornography and engaged in inappropriate sexual behavior in the home. They engaged in animal abuse on several occasions, including intentionally killing their pet hermit crabs. Alyse and Arianna also continually witnessed the chaotic environment and abuse in the home.

Joy was concerned about the level of stress the children were subjected to, and she initially sought treatment for one of the older daughters at North Star Hospital, a behavioral health facility. For a time, the entire family was voluntarily being seen by a counselor at Anchorage Community Mental Health. The older two daughters were frequently in and out of psychiatric treatment facilities, and Alyse also spent time at North Star Hospital in November 2013. Although Joy was initially supportive of some treatment options for her daughters, she later began to resist treatment for the girls and indicated that she did not believe in treatment or medication other than cannabis.

In the intake interviews and ongoing counseling at many of these treatment facilities, the girls revealed their history of domestic violence and the continuing conflict in their home. These disclosures and some of the police calls triggered mandatory reporting requirements, and OCS ultimately received at least 14 reports relating to the family. OCS first became actively involved with the family in 2014.

C.    **OCS Involvement And Probable Cause Hearings**

By early 2014 OCS had compiled a file and assigned a caseworker to the family. The OCS caseworker first interviewed juvenile probation officers who had come in contact with the family, and she began interviewing the girls directly in early February 2014. Also in early February 2014, Drake discovered that Joy and the

daughters were in Alaska, and he filed a petition for custody of all six children in county court in Ohio.

In response to Drake's petition and other concerns regarding the children's safety, OCS filed an emergency petition for temporary custody and adjudication of Child in Need of Aid status with respect to all four girls on February 27, 2014. OCS's petition recounted Abby and Amy's disclosures of severe abuse in Ohio as well as reports of ongoing turmoil in Joy's home in Alaska, discussing Abby and Amy's involvement with the Division of Juvenile Justice and noting that "the four girls are all out of control, always yelling, cursing and physically fighting with each other and the mother." The petition sought an order committing the four girls to State custody.

The superior court held a hearing on the emergency petition on February 28, 2014. The court continued the temporary custody hearing but issued an interim order granting temporary State custody of Abby and Amy. The court did not grant temporary custody of Alyse and Arianna at that time. Accordingly, Abby and Amy were removed from Joy's home on February 28, while Alyse and Arianna remained in the home.

As OCS became more involved with the family, Joy became increasingly antagonistic to OCS's efforts. In developing a case plan for the family, OCS requested that Joy complete a mental health assessment that would allow OCS to evaluate her needs and plan accordingly, but Joy refused to complete the assessment. Joy also repeatedly refused to allow OCS into her home to conduct safety checks on Alyse and Arianna, even after OCS obtained a court order requiring her to do so. Joy began blocking Amy's access to inpatient treatment at several behavioral health facilities. Altercations within the home continued, and at one point OCS received a report that Joy had hit Amy with a belt and a white board.

In response to this incident and Joy's lack of cooperation, OCS filed an amended emergency petition on June 23, 2014, again seeking State custody of all four daughters. The petition recounted Joy's obstruction of OCS's efforts and the recent altercation with Amy. Regarding the younger daughters, the petition alleged that "[Alyse] and [Arianna] are the most vulnerable in the home. They b[ear] witness to the chaotic environment and ongoing abuse within the home. The violence in the home is unmanageable and the younger children are at significant risk of being injured themselves, if not already." The petition explained OCS's view that Joy was "not in a healthy position to make safe, reasonable parenting decisions for any of her children at this point" and that, in addition to refusing the mental health assessment, Joy "believe[d] parent coaching or instructions [were] meaningless for her." Finally, the petition noted that Joy had "declared to the court . . . that she would rather have OCS remove all of her children from her home, than . . . allow OCS into her home."

As a result of this amended petition and evidence presented at the temporary custody hearing, the superior court issued a probable cause finding and temporary custody order effective June 23, 2014. The court concluded that probable cause existed to believe that all four daughters were children in need of aid under Alaska Statute 47.10.011. It also found that placement in Joy's home was "contrary to the welfare of each child," finding that "[t]he children remain[ed] at risk of substantial physical abuse by their mother and by the failure of their mother to supervise them adequately." The court noted that Joy "used threats of sending the children back to their father and told [Abby] that the family would return to Ohio as soon as OCS was out of the picture." The court cited some of OCS's reunification efforts and found that these "efforts ha[d] been thwarted by the father's disappearance and the mother's stonewalling."

Alyse and Arianna were removed from Joy's home on June 23, 2014, the final day of the temporary custody hearing. Amy, Alyse, and Arianna were initially placed in a foster home together. Abby already was living in a therapeutic foster home and would continue to live in foster care through the termination trial, by which time she had turned 18. OCS developed a case plan for the family, but Joy did not want to participate in the case plan. Joy also continued to refuse a mental health assessment, which OCS maintained would allow the department to adjust the case plan according to her needs.

OCS nonetheless continued to reach out to Joy in numerous ways. As part of its efforts to improve her parenting capacity in the wake of the trauma she had suffered, OCS provided Joy with therapeutic recommendations including counseling services and parenting classes. OCS gave Joy a copy of the case plan for the family, which included addresses and phone numbers for specific service providers. The case plan stated that the permanency goal for each child was reunification with Joy. OCS did not specifically refer Joy to a domestic violence victims assistance program, but according to OCS, other recommended therapeutic options, such as Anchorage Community Health Services, offer domestic violence victims services; Joy refused to engage with them.

OCS held an estimated 40 to 50 team decision meetings with Joy and her daughters in an effort to implement the case plan and help the family make progress toward reunification. Joy usually attended telephonically rather than in person, even when she was in Anchorage. Joy frequently yelled at the OCS representatives during these meetings and refused to cooperate with the case plan; by one caseworker's estimate, Joy yelled roughly 70% of the time during her interactions with OCS. Joy repeatedly indicated that she would rather relinquish her rights to her children than work with OCS.

Although Joy was prohibited from having unsupervised contact with the girls, she sometimes spoke with the girls on the phone without OCS supervision. In July 2014, the girls secretly arranged to meet Joy at the library after their foster mother dropped them off there. There was a confrontation between Joy and the foster mother, and when the foster mother got the girls in the car and drove away, the girls jumped out of the car. Alyse and Amy were found and brought to North Star Hospital, where they remained for about a month. Although Abby visited her sisters in the hospital, Joy did not visit them during the time they were there because she refused to have her visits supervised. After this incident, OCS decided that Amy, Alyse, and Arianna should no longer be placed in the same foster home, so OCS found new foster homes for Alyse and Amy.

In October 2014 Joy left the state; she has not returned, nor has she seen her children since she left. Joy initially told her daughters that she was leaving to attend a family gathering and would be returning to Alaska, but she later told them that she would not be returning. Joy did not tell OCS that she was leaving. Joy left her home in the care of a man who contacted the girls and threatened to kill their pet rabbit if they did not obey him, although the girls were living in foster homes at the time. Also in October 2014, OCS obtained a court order to compel Joy to comply with the psychological evaluation that OCS had requested, but Joy had already left the state by the time the order was issued.

OCS made an effort to stay in contact with Joy after she left the state. At first Joy lived with family and friends, and occasionally in hotels, in several different states. By the fall of 2015 Joy was homeless. Although she was hard to get in touch with, the family's OCS caseworker continued to talk with Joy by phone when possible. In addition to keeping Joy up to date on her daughters' placements and treatments, the caseworker also tried to "problem solve" with Joy to help her get housing. OCS learned

that Joy had completed a psychological evaluation in another state as part of the process of seeking shelter, but OCS was unable to obtain a copy of this evaluation until Joy's lawyer provided it roughly a month before the termination hearing. According to OCS, this evaluation was quite different from the mental health assessment that OCS had requested while Joy was in Alaska, as it did not address her parenting capacity, the children's family history, or OCS's involvement with the family.

At one point after Joy had left the state, the OCS caseworker talked with Joy about trying to find a way for her to see her children. Although OCS could not pay for Joy's permanent relocation to Alaska, OCS took the unusual step of purchasing plane tickets for Joy so that she could come visit her daughters here. Joy initially confirmed that she wanted the tickets, but once OCS had purchased them, Joy's lawyer contacted OCS to say that the dates would not work for Joy. Neither Joy nor her lawyer responded to OCS's subsequent request that Joy provide different dates so that OCS could change the tickets and allow Joy to visit her children.

Meanwhile, the girls were somewhat more stable after Joy left Alaska. Although Joy initially had occasional supervised telephonic visits and some unsupervised contact with her daughters, by the summer of 2015 she was hard to get in touch with and had less frequent contact with the girls. Amy continued to struggle more than the other girls, but both Alyse and Arianna were making significant improvements and were doing well in their foster homes. Alyse indicated that she wanted to be adopted by her foster mother. Although Arianna's foster home was not considered a potential adoptive home, Arianna was doing well there, and she had not talked to Joy for several months by the time of the termination hearing in fall 2015. There remained a strong bond between the sisters; the girls indicated that they missed their family and still loved their mother, but they could also articulate to OCS caseworkers and other counselors "why it[ was] not safe to be in their parents' home."

**D. Termination Trial**

OCS petitioned for termination of the parents' parental rights with respect to all four daughters on April 2, 2015, and a two-day termination trial was held in November 2015. The trial was originally scheduled for July 2015, but the superior court granted Joy's request to continue the trial until November. Ultimately the termination trial moved forward only with respect to Alyse and Arianna.[2]

Neither Joy nor Drake participated in the termination trial, despite the fact that the hearing had been continued until November at Joy's request. Both Joy and Drake were represented by counsel who were present at trial. The State called thirteen witnesses: four current and former OCS caseworkers and supervisors, four Anchorage Police Department officers and one juvenile probation officer, two mental health clinicians who had seen the family, and Alyse's and Arianna's current foster mothers. These witnesses testified to the facts described above, including the daughters' disclosures of torture and abuse in Ohio, the continued chaos and struggles in Joy's home in Alaska, Joy's escalating refusal to cooperate with OCS and her departure from Alaska, and the younger children's progress in their foster homes. Neither Joy nor Drake called any witnesses.

After the two-day trial, the superior court issued an oral decision terminating Joy's and Drake's parental rights with respect to Alyse and Arianna. The court subsequently issued a written decision confirming this result.

---

[2] Abby had turned 18 by the date of the November trial, and OCS ultimately decided not to move for termination of parental rights with respect to Amy because it would not be in her best interests given that she was likely going to enter a residential treatment program soon and had indicated that she did not want to be adopted. Instead, OCS sought a determination that OCS be relieved of further reasonable efforts with respect to Amy.

In its decision the superior court found, by clear and convincing evidence, that both Joy and Drake had caused Alyse and Arianna to be in need of aid under the abandonment provisions of AS 47.10.011(1) and AS 47.10.013(2), (3), (4), (7), and (8). The court cited the fact that Joy had left Alaska a year earlier without notifying OCS and had not returned to see her children, had stopped calling her daughters in the months leading up to trial, and had told OCS that "she would rather relinquish her parental rights than work with the department." The court found that "[b]y removing themselves from the lives of their children, [Drake and Joy] ha[d] evidenced a conscious disregard for parental obligations" and that "[b]y failing to participate in a plan designed to reunify them with their children, both parents ha[d] allowed the parent-child bonds to break." The court concluded that Joy's and Drake's conduct met the abandonment test set forth by this court.[3]

The court next found that both parents had caused Alyse and Arianna to be in need of aid under AS 47.10.011(4) (failure to provide medical treatment), (6) (physical harm), (8) (mental injury), and (9) (neglect). The court cited the continual fighting in Joy's home in Alaska, the girls' involvement with the juvenile justice system, and Joy's resistance to appropriate psychiatric treatment for her daughters and obstructionism with respect to OCS.

The superior court next found that the parents had not remedied, or had failed to remedy within a reasonable time, the conduct and conditions that put the children in need of aid. The court found that Joy had "made no meaningful attempts to engage in services" and had failed to complete the psychological evaluation that would have allowed OCS to assess her needs, noting that the out-of-state evaluation Joy

---

[3]    *See, e.g., Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335-36 (Alaska 2011).

completed in October 2015 was a year late and "was not a genuine effort to comply with the case plan." The court explained that Joy had refused to participate in supervised visits with her children and then later "left them altogether" when she moved out of Alaska. The court noted the progress that Alyse and Arianna had made since being placed in their foster homes, and it concluded that returning Alyse and Arianna to their natural parents would put "each child . . . at risk of losing the gains she ha[d] made" and "would clearly place the children at substantial risk of physical or mental injury."

The superior court next found, by clear and convincing evidence, that OCS had made reasonable efforts to reunite the family as required under AS 47.10.086. The court cited a number of the specific efforts OCS had made, including offering supervised family contact, conducting numerous team decision meetings with the family, referring Joy for a psychological evaluation, developing a case plan to meet Joy's and the children's needs, arranging therapeutic services for the girls and providing opportunities for Joy to participate in her daughters' therapy, identifying therapeutic foster placements for the girls, attending school meetings and therapeutic team meetings for the girls, trying to maintain contact with Joy through calls and emails, and arranging to fly Joy back to Alaska to visit her daughters. The court explained that Joy's "unwillingness to participate in services [was] relevant to the scope of efforts the department could reasonably provide" and noted that Joy, "at every turn, was adamant in her refusal to address the problems in her home and rejected all assistan[ce] from [OCS]."[4]

Finally, the superior court found by clear and convincing evidence that termination of Joy's and Drake's rights would be in Alyse's and Arianna's best interests.

---

[4] The court also relied on the same factual findings to conclude that there was clear and convincing evidence that the parents had subjected the children to various other harmful circumstances under AS 47.10.086(c)(1), which sometimes relieves OCS of the duty to make reasonable efforts, but the parties have not raised this issue on appeal.

The court noted that the girls had been in OCS custody for 17 months and found that "during that time, the parental conduct and circumstances that resulted in the need for removal ha[d] not changed."  The court found that "after a year of intense therapy and placement in therapeutic foster homes[,] . . . the two younger girls ha[d] achieved some level of success," mentioning Alyse's successful placement in a potential adoptive home.  Thus, the court concluded that "[i]t is in [Alyse's] and [Arianna's] best interests to be adopted into forever homes."

The superior court accordingly ordered that Joy's and Drake's parental rights be terminated with respect to Alyse and Arianna under AS 47.10.088.  The court also ordered that reasonable efforts were no longer required under AS 47.10.086(a) with respect to Alyse, Arianna, or Amy.  Joy appeals the termination of her parental rights with respect to Alyse and Arianna, but she does not appeal the superior court's finding that the children were in need of aid or the order relieving OCS of further efforts with respect to Amy.  Drake did not appeal the termination of his parental rights.

## III.   STANDARD OF REVIEW

"In [Child in Need of Aid (CINA)] cases, we review a trial court's factual findings for clear error and questions of law de novo."[5]  "Whether the parent has remedied the conduct is a factual determination best made by a trial court," and therefore we review this question for clear error.[6]  Similarly, "[b]est interests findings are also

---

[5]   *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[6]   *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1240 (Alaska 2015) (citing *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008-09 (Alaska 2011)).

factual findings reviewed for clear error."[7] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[8] For mixed questions, "we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[9] We will conclude that "[f]actual findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[10]

## IV. DISCUSSION

Alaska Statute 47.10.088(a) provides that a parent's rights may be involuntarily terminated only if: (1) "the child has been subjected to conduct or conditions" that caused him or her to be in need of aid as described in AS 47.10.011; (2) "the parent . . . has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury"; and (3) OCS has made "reasonable efforts" toward family reunification as described in AS 47.10.086. AS 47.10.088(c) further provides that in a proceeding to terminate parental rights, "the court shall consider the best interests of the child."

Joy does not contest that her children were in need of aid as defined in AS 47.10.011, but she appeals the superior court's findings that she failed to remedy the

---

[7] *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1273 (Alaska 2014) (citing *Sherman B.*, 290 P.3d at 428).

[8] *Id.* at 1273-74 (quoting *Sherman B.*, 290 P.3d at 428).

[9] *Id.* at 1274 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[10] *Chloe W.*, 336 P.3d at 1264 (citing *Sherman B.*, 290 P.3d at 427-28).

conduct and conditions that made them in need of aid,[11] that OCS had made reasonable efforts toward family reunification,[12] and that termination of parental rights was in Alyse's and Arianna's best interests.[13] We consider these issues in turn.

### A. The Superior Court Did Not Clearly Err In Finding That Joy Had Failed To Remedy The Conduct That Made The Children In Need Of Aid.

Once a child is found to be in need of aid, the court must consider whether the parent has remedied the conduct or conditions that caused the child to be in need of aid. To involuntarily terminate a parent's rights, the superior court must find by clear and convincing evidence that the parent has failed to timely remedy the conduct or conditions that rendered the child in need of aid.[14] In making a determination about a parent's failure to remedy, "the court may consider any fact relating to the best interests of the child," including "the harm caused to the child," the parent's efforts to remedy the harmful conduct or conditions, "the likelihood that the harmful conduct will continue," and "the history of conduct by or conditions created by the parent."[15] In determining the likelihood that a parent's harmful conduct will continue, the court may consider a parent's history of harmful conduct "as a predictor of future behavior."[16]

---

[11]    *See* AS 47.10.088(a)(2).

[12]    *See* AS 47.10.086, .088(a)(3).

[13]    *See* AS 47.10.088(c).

[14]    AS 47.10.088(a)(2); CINA Rule 18(c)(1).

[15]    AS 47.10.088(b).

[16]    *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)).

Joy challenges the superior court's finding that "[nothing] at all has been remedied," arguing that removing her daughters from Drake's home and bringing them to Alaska was an enormous step to protect them from abuse. But OCS counters that its termination petition was not focused solely on Drake's abuse; rather, "it was Joy's conduct while in Alaska that continued to place the children in need of aid." Indeed, the termination petition detailed the ongoing confrontations and instability in Joy's home in Alaska and her continued volatile and uncooperative behavior. So ultimately the question before us is whether Joy remedied the continued harmful and neglectful conduct that occurred after the move to Alaska. We conclude that she did not.

Joy argues that there was no direct evidence of Alyse or Arianna suffering physical harm in Joy's home. But OCS correctly notes that the superior court found the children to be in need of aid on multiple statutory grounds, many of which do not require a showing of physical harm. In particular, the court found the children to be in need of aid under the abandonment provisions of AS 47.10.011(1) and AS 47.10.013(2), (3), (4), and (8), which provide that abandonment includes instances where the parent "has made only minimal efforts to support and communicate with the child";[17] "failed for a period of at least six months to maintain regular visitation with the child";[18] "failed to participate in a suitable plan or program designed to reunite the parent . . . with the child";[19] or "was unwilling to provide care, support, or supervision for the child."[20] As we have explained in past cases, a finding of abandonment under these statutory factors requires parental

---

[17]     AS 47.10.013(2).

[18]     AS 47.10.013(3).

[19]     AS 47.10.013(4).

[20]     AS 47.10.013(8).

conduct that "evidenc[es] a 'willful disregard' for parental obligations, leading to . . . the destruction of the parent-child relationship."[21]

Joy has raised no challenge to the superior court's findings on abandonment, and the record strongly supports the finding of abandonment and Joy's failure to remedy it. Evidence at trial showed that Joy adamantly refused to participate in her case plan and often refused opportunities to visit with her children because she did not want to engage in supervised visits. Rather than remedying this conduct, Joy eventually left her daughters in Alaska and maintained only sporadic communication with them after that point; by the time of the termination hearing, she had not spoken with Arianna for a month or two. Joy also failed to take advantage of the unusual opportunity provided by OCS to travel back to Alaska and visit her daughters. And Joy did not participate in the termination trial despite the fact that the trial date was changed at her request.

Joy's repeated refusals to participate in supervised visits and her departure from the state, coupled with the lack of contact and failure to return when OCS bought plane tickets for her, are more than sufficient to demonstrate "a 'willful disregard' for parental obligations, leading to . . . the destruction of the parent-child relationship."[22] Ultimately, Joy's continued and escalating isolation from her daughters supports the superior court's finding that she failed to remedy her abandonment of her daughters.

Termination of parental rights may be based on a parent's failure to remedy a single statutory element of the conduct or conditions that cause the child to be in need

---

[21] *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)).

[22] *Id.*

of aid.[23] We have previously affirmed failure-to-remedy findings based on abandonment alone.[24] So Joy's failure to remedy the abandonment of her daughters is sufficient to support the superior court's finding that Joy failed to remedy the conduct and conditions that made Alyse and Arianna in need of aid.[25]

Moreover, a court can consider a parent's history of behavior "as a predictor of future behavior,"[26] and Joy's past conduct suggests that Joy will continue to engage in conduct that puts her children in need of aid. This is particularly true in light of Joy's refusal to improve her conduct by engaging in counseling, participating in OCS's case plan, or even completing a mental health evaluation — which gives little indication that her parenting capacity will improve within a reasonable time. And although, as Joy points out on appeal, her harmful conduct and failure to remedy her conduct almost certainly stem from her own history of abuse and trauma, this tragic fact does not change the CINA analysis, which focuses on the impact on the children and the

---

[23] *See Rick P.*, 109 P.3d at 956 ("[O]ur determination that the mental injury finding was not erroneous makes it unnecessary to consider Rick's challenges to these other findings [under AS 47.10.011]."); *see also Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 431 (Alaska 2015) (citing *Sherman B.*, 290 P.3d at 431) (concluding that any error with respect to the mental illness factor was harmless because the superior court's findings on the abandonment and substance abuse factors were affirmable).

[24] *Sherman B.*, 290 P.3d at 431 (citing *Rick P.*, 109 P.3d at 956).

[25] It is likely that Joy also failed to remedy her conduct that made her daughters in need of aid under the other statutory prongs cited by the superior court, but we need not review these findings in light of our conclusion that Joy failed to remedy her abandonment of her daughters.

[26] *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)).

children's best interest.[27] For all of these reasons, we conclude that the superior court did not err in finding that Joy failed to remedy the conduct and conditions that made Alyse and Arianna in need of aid.

**B.** **The Superior Court Did Not Err In Concluding That OCS Made Reasonable Efforts To Reunify Joy And Her Daughters.**

AS 47.10.086(a) and AS 47.10.088(a) require a finding, by clear and convincing evidence, that OCS has made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."[28] These efforts must include "(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid" and "(2) actively offer[ing] the parent . . . and referr[ing] the parent" to these services.[29] OCS must also document its actions in identifying and offering these services.[30]

We have explained that "[r]eunification efforts . . . need only be reasonable under the circumstances," which include "the parent's level of cooperation with OCS's

---

[27] *See* AS 47.10.088(b) ("In making a determination under (a)(2) of this section [regarding failure to remedy], the court may consider any fact relating to the best interests of the child . . . .").

[28] AS 47.10.86(a); *see also* CINA Rule 18(c)(2).

[29] AS 47.10.086(a)(1)-(2).

[30] AS 47.10.086(a)(3).

efforts."[31] And even in this reasonable efforts inquiry, AS 47.10.086(f) provides that the "primary consideration" is still the child's best interests.

In this case, the superior court found that OCS had made reasonable efforts as defined under AS 47.10.086(a). The record shows that OCS made significant, continual efforts to help Joy and her daughters over the course of nearly two years. OCS created a case plan for the family and attempted to involve Joy in the plan, held numerous team decision meetings with Joy and her daughters, and offered Joy a number of services intended to help improve her relationship with her daughters, including parenting classes, "healthy relationship classes," and parenting skills mentoring. Despite Joy's repeated refusals to engage in supervised visits with her daughters, OCS continued to keep Joy apprised of her children's placements and treatments, and it continually sought ways for Joy to have contact with her children if she agreed to have her visits supervised. The record shows that Joy generally refused to comply with OCS's requests, denied OCS entry into the house despite a court order, yelled at caseworkers, and repeatedly said that she would rather relinquish her parental rights than work with OCS. Joy later became difficult to contact and ultimately left the state without informing OCS.[32]

---

[31] *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 953 (Alaska 2013)).

[32] Although Joy now argues that OCS should have helped her with her housing and job search, at trial OCS explained that Joy had adequate housing while she was in Alaska and that it did refer Joy to services that could have helped her with a job search if she had opted to participate in these services. An OCS caseworker also testified that she tried to "problem solve" with Joy to help her get housing even after Joy had left Alaska.

Joy challenges the superior court's reasonable efforts finding by arguing that AS 47.10.086(a) requires OCS to identify and provide "the right services" for her and that it failed to do so. Joy argues that she required specific domestic violence related services, yet she was assigned a caseworker with no training or experience in domestic violence, and her case plan included no domestic violence specific referrals or counseling. Joy contends that OCS's "efforts were patently unreasonable as they failed to consider and to account for the mother's experience as a victim of traumatic domestic violence." Joy also suggests that OCS actually made the situation worse by removing her daughters from her home. She thus argues that the superior court erred in failing to evaluate OCS's efforts in light of her specific situation and her "extreme victimized state."

But these arguments are undermined by Joy's own refusal to complete the psychological evaluation requested by OCS, which would have allowed OCS to assess her needs and recommend services to meet those needs. OCS might have been better able to help Joy if she had been willing to take this threshold step, but OCS explains that Joy "rebuffed the efforts (psychological evaluation) that would have allowed her case plan to be more closely tailored to her domestic violence background." The record supports this assertion. OCS also argues that the family's case plan could have been adjusted to meet Joy's needs if she had participated in other elements of the plan. Yet she adamantly refused to participate. Additionally, OCS was aware that Joy had suffered under domestic violence for 20 years and "focused on getting her therapeutic support" and "addressing her very obvious PTSD." OCS referred Joy for individual and family therapy at Anchorage Community Mental Health Services, which OCS indicated also provides services specifically for domestic violence victims, but Joy did not engage with the case plan and therefore did not receive the benefit of the therapies OCS made available to her.

Our precedent explains that OCS is not required to seek a court order to compel a parent to participate in services if the parent is unwilling.[33] OCS nonetheless took that step here by obtaining a court order compelling Joy to complete a psychological evaluation. Yet Joy still did not complete an appropriate evaluation. Testimony at trial demonstrated that the evaluation Joy completed out-of-state in late 2015, a year after the court order, was inadequate for OCS's case-planning purposes as it failed to address her parenting capacity or the children's family history. Because Joy repeatedly refused to allow OCS to assess her needs, her argument that OCS should have provided specific services to suit those needs is without merit.

Moreover, our precedent expressly indicates that a parent's participation or lack thereof is relevant to the scope of efforts that OCS must make.[34] In a case where a parent refused to talk with OCS caseworkers, refused to comply with OCS's conditions regarding supervised visits, and refused to complete a psychological evaluation, we concluded that OCS's attempts to provide services and find safe means of facilitating visitation satisfied the reasonable efforts requirement in light of the parent's noncooperation.[35] Here, too, we conclude that the superior court did not err in finding that OCS's efforts were reasonable under AS 47.10.086, in the face of Joy's repeated refusals to complete a psychological evaluation, to take advantage of the services that OCS did offer, or to work with OCS in any way.

---

[33] *See Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008).

[34] *E.g.*, *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 850 (Alaska 2014) (quoting *Sherman B.*, 290 P.3d at 432); *Wilson W.*, 185 P.3d at 101 (citing *K.N. v. State*, 856 P.2d 468, 477 (Alaska 1993)).

[35] *Wilson W.*, 185 P.3d at 102-03.

**C.** **The Superior Court Did Not Clearly Err In Finding That Termination Of Joy's Parental Rights Is In Alyse's And Arianna's Best Interests.**

AS 47.10.088(c) mandates that "[i]n a proceeding under this chapter involving termination of . . . parental right[s] . . . , the court shall consider the best interests of the child." Joy argues that the superior court erred in finding that termination was in Alyse's and Arianna's best interests under this provision, contending that there was insufficient evidence to support the court's finding. Joy cites literature on domestic violence that advises "view[ing] the child and non-offending parent as a unit" and suggests that "what is in the best interest of the mother is actually what is in the best interest of the child." Based on these theories, Joy appears to argue that separating her from her daughters is harmful to all of them and thus contrary to Alyse's and Arianna's best interests.

But OCS correctly responds that under Alaska law, "the best interests of the child, not those of the parents, are paramount."[36] And we cannot conclude that Joy's best interests are aligned with those of her children at this point. Alyse specifically indicated that she hopes to be adopted by her foster mother; this suggests that termination of Joy's parental rights is in Alyse's best interest because it will allow Alyse to realize this goal and achieve permanency and stability. Arianna is also doing well in her foster placement and was having only sporadic communication with Joy in the months leading up to the termination hearing. The superior court found that the girls need stability and an opportunity for adoption. Although Joy argues that the girls have "struggled greatly" in their placements, this contention is not supported by the testimony at trial, which showed

---

[36] *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1166 (Alaska 2000) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 260 (Alaska 1999)).

that both Alyse and Arianna had become happier and that their behavior had improved since being placed in foster homes.

Joy faults the superior court for not mentioning Arianna's foster placement in its termination order, in light of the fact that Arianna is not yet in a potential adoptive home. But the lack of an adoptive home is "not necessarily . . . a decisive factor in deciding whether to terminate parental rights,"[37] and we have previously affirmed the termination of parental rights even when the likelihood of finding a long-term adoptive home was low.[38] Here, there is no indication that OCS will be unable to find a permanent home for Arianna. The fact that Arianna is not yet in a definitive adoptive home does not preclude a finding that termination is in her best interest.

Joy also emphasizes that the bond between her and her daughters is strong and asserts that her daughters need to be with her for their mutual recovery process. But our precedent makes clear that the existence of a bond between a parent and a child is not dispositive in the best-interests inquiry; in fact, we have affirmed termination in cases where the parent similarly claimed a strong, loving bond with his or her child.[39] Accordingly, Joy's bond with her daughters is insufficient to overturn the superior court's finding that termination is in Alyse's and Arianna's best interests.

---

[37] *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008).

[38] *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1125 (Alaska 2002).

[39] *E.g.*, *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270-71 (Alaska 2014); *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1278-79 (Alaska 2014); *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010).

Finally, in arguing that the superior court erred in its best-interests analysis, Joy also points to AS 47.10.088(b), which provides that the court may consider the best interests of the child specifically in making a determination on the parent's failure to remedy under AS 47.10.088(a)(2).[40] Joy notes that AS 47.10.088(b) provides a list of factors that the court may consider relating to the best interests of the child, including

> (1) the likelihood of returning the child to the parent within a reasonable time . . . ; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.

Joy argues that the superior court erred by failing to discuss any of these factors in its oral or written orders. But AS 47.10.088(b) only provides that "the court *may* consider" any of the enumerated factors; it does not create a duty for the court to do so.[41] The fact that the court did not expressly cite these factors is not grounds for reversing the superior court's finding.

Moreover, although the superior court did not expressly mention the factors listed in AS 47.10.088(b), it did make factual findings relevant to several of these factors. The court cited Joy's lack of cooperation with OCS and her unwillingness to change her behavior, which is relevant to "the amount of effort by the parent to remedy the conduct or the conditions in the home."[42] The court also cited the girls' "maladaptive behaviors

---

[40] AS 47.10.088(b) provides that "[i]n making a determination under (a)(2) of this section [regarding failure to remedy], the court may consider any fact relating to the best interests of the child," including certain enumerated factors relating to the parent's conduct and its impact on the child.

[41] *See* AS 47.10.088(b) (emphasis added).

[42] *See* AS 47.10.088(b)(2).

learned from their chaotic and abusive family home," which is relevant to "the harm caused to the child."[43] The court noted that the children had been in State custody for 17 months by the time of the termination hearing and found that "[w]ithout supportive, nurturing, consistent caregivers, each child is at risk of losing the gains she has made" during that time. These findings are relevant to "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs."[44] The findings regarding Joy's failure to make meaningful progress during this period are similarly relevant to the likelihood of returning Alyse and Arianna to Joy's home within a reasonable time[45] and to "the likelihood that the harmful conduct will continue."[46]

All of these findings are supported by the record, and they all point toward the conclusion that termination of Joy's parental rights is in Alyse's and Arianna's best interests. Ultimately, although the superior court did not cite them directly, it considered a number of the relevant statutory factors in finding that termination was in Alyse's and Arianna's best interests. Given the circumstances, particularly Joy's lack of progress and the girls' significant progress in foster care, the superior court did not clearly err in finding that termination serves Alyse's and Arianna's best interests.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Joy's parental rights to Alyse and Arianna.

---

[43]    *See* AS 47.10.088(b)(3).

[44]    *See* AS 47.10.088(b)(1).

[45]    *See id.*

[46]    *See* AS 47.10.088(b)(4).