NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALYSE B. (Mother), | ) |
| | ) Supreme Court No. S-18297 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-19-00490 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1933 – November 30, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter Ramgren, Judge.

Appearances: Megan M. Rowe, Alaska Legal Drafting, Anchorage, for Appellant. Kevin A. Higgins, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

After a mother was incarcerated for violating conditions of her probation, the Office of Children's Services (OCS) took custody of her month-old daughter. The mother was in punitive segregation for much of the subsequent child in need of aid (CINA) proceedings, and she was expelled from classes to which OCS referred her.

---

\* Entered under Alaska Appellate Rule 214.

After her release the mother completed a substance abuse assessment and had some visitation with her daughter, but after an in-person visit was cancelled she stopped communicating with OCS. The superior court terminated her parental rights following a trial at which she did not appear.

The mother now appeals, arguing that the superior court erred by finding that OCS made reasonable efforts to reunify the family, that the superior court erred by finding she failed to remedy the conditions that placed her daughter at risk of harm, and that she was denied effective assistance of counsel. We see no error and therefore affirm the termination order.

## II.     FACTS AND PROCEEDINGS

### A.     Background

Alyse B.,[1] whose parental rights are at issue in this appeal, is the daughter of a woman whose own parental rights were terminated in 2015.[2] As we described in our opinion in that case, Alyse was subjected to extreme physical abuse and torture by her father before OCS took custody of her at age 14;[3] OCS also suspected that Alyse had been sex trafficked by her mother. In January 2018, when Alyse was 18, the federal government charged her with conspiring to produce and possess child pornography because of her alleged involvement in the sex trafficking of her younger sister. Alyse was placed on ankle monitoring and home detention; her conditions of release included requirements that she abstain from substance use, participate in drug testing, have no contact with minors, including her biological sisters, and live apart from her biological

---

[1]     We use pseudonyms for all family members to protect their privacy.

[2]     *See Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154 (Alaska 2016).

[3]     *Id*. at 1156.

mother.

Alyse became pregnant with her daughter, Octavia, later that year. When Alyse was approximately three months pregnant she was shot in the stomach by the child's father, Trace. Both mother and child survived, and the baby was born in July 2019. A month later Alyse was arrested for violating conditions of her probation, including testing positive for cocaine, marijuana, and alcohol and residing with her mother and sister.

## B. OCS Involvement

OCS took emergency custody of Octavia "due to [Alyse's] substance use . . . [,] charges of child pornography," and the fact that both Alyse and Trace were now incarcerated. OCS took Octavia for a medical screening, which showed cocaine exposure, then placed her in a foster home.

The first OCS caseworker assigned to the case spoke with the OCS liaison at Hiland Correctional Center, where Alyse was incarcerated, about the services that were available, then recommended that Alyse obtain a substance abuse assessment and attend parenting and anger management classes. The caseworker testified that he spoke with Alyse a number of times and sent her pictures of Octavia but was informed by the OCS liaison that Alyse was not permitted to have contact with Octavia because of the nature of the federal charges pending against her.

A second OCS caseworker, assigned to the case in September 2019, also testified that she spoke with Alyse regularly and sent her pictures of Octavia. She created Alyse's first case plan in October. It recommended that Alyse complete a substance abuse assessment and follow its recommendations; complete a mental health assessment and follow its recommendations; submit to urinalysis; complete a sexual risk assessment and follow its recommendations; attend individual counseling; attend parenting, anger management, healthy relationships, and domestic violence classes; find

and maintain employment and housing; and maintain contact with Octavia. The caseworker testified that she discussed this case plan with Alyse and sent her a copy.

The caseworker testified that for a time Alyse was "good at reaching out . . . and maintaining contact" with OCS and attending classes, but that the OCS liaison at Hiland reported that after the onset of the pandemic in early 2020, Alyse was placed in punitive segregation because of behavioral issues, and lost access to the classes. The caseworker continued to communicate with Alyse and updated the case plan in March 2020, though the recommendations remained the same as before. The record reflects that OCS prepared additional case plans in September 2020, March 2021, and May 2021.

Alyse was released from custody in April 2021. The caseworker continued to communicate with Alyse and made referrals to various organizations for substance abuse help and case management services, healthy relationships and parenting classes, and a substance abuse assessment. Alyse attended the substance abuse assessment but did not engage in any of the recommended treatment. Between April and June she had several videoconference visits and one in-person visit with Octavia. In July OCS agreed to allow her and her sisters to visit Octavia on the child's second birthday, but Alyse's federal probation officer did not approve the contact and the visit was cancelled.[4]

The caseworker testified that despite continuing to reach out and send Alyse photos, she last heard from Alyse on July 26, 2021. The caseworker stayed in touch with Alyse's probation officer, who reported that he had also been unable to contact her but had learned she had tested positive for marijuana "a couple of times" and was asked to

---

[4] Alyse's probation conditions prohibited "contact with any person under the age of 18 years without adult supervision . . . except under circumstances approved in advance and in writing by the probation officer in consultation with the defendant's treatment provider." The caseworker testified that Alyse's probation officer denied the request because "[h]e said he was not approving any contact for her."

leave her new job after ten days, in part because of her employer's concerns that she was engaged in sex work again.

## C. Proceedings

### 1. Preliminary proceedings

An emergency probable cause hearing was first held in August 2019. The court determined that Octavia was a child in need of aid and stated its intent to appoint an attorney to represent Alyse. The Office of Public Advocacy (OPA) contracted with attorney Paul Tony to represent her.

Tony asked for continuances repeatedly throughout the case's early stages on grounds that he had not had the opportunity to speak with his client. After he failed to appear at two consecutive hearings, the court scheduled a representation hearing. Tony did not appear at that hearing either, and the court ordered OPA to provide Alyse with a different attorney. In March Olivia Mackin assumed the representation.

The court held a permanency hearing in August 2021. Mackin noted the cancellation of Alyse's second in-person visit with Octavia based on the probation officer's failure to approve it, and she requested leave to file an objection to the cancellation. The court gave the parties ten days to file any objections, but it does not appear that any were filed.

### 2. Termination trial

A termination trial was held in late September 2021. Alyse was not present, and OCS had not been able to reach her for several months. OCS called Octavia's two caseworkers to testify.

In closing argument OCS contended that it had "immediately engaged in case-planning services for [Alyse]" and its case plans "were reasonably outlined" with "no real surprises as to what was being required of [Alyse]." It argued that Alyse's engagement with OCS's recommendations was "thwarted and complicated by her

continued placement in segregation and being kicked out of programs offered to her by the Department of Corrections [(DOC)]." It argued that after Alyse was released, she was given one "last chance to work on a reunification plan" but "appeared to abandon attempts to reunify with [Octavia]." Octavia's guardian ad litem agreed with OCS's position.

Mackin emphasized that Alyse was in custody for the majority of the case, and "[w]hen she got out, she was doing well and . . . was very much looking forward to her second in-person visit with [Octavia]." As evidence of OCS's lack of reasonable efforts to reunify the family, Mackin pointed to the cancellation of Alyse's second in-person visit with her daughter and OCS's subsequent failure to advocate for more visitation.

### 3.    Order terminating Alyse's parental rights

At the close of the evidence the court placed its decision on the record, following up with a later written order. The court found that Octavia remained a child in need of aid pursuant to both AS 47.10.011(1) (abandonment) based on Alyse's failure to engage in her case plan and AS 47.10.011(10) (substance abuse) based on Octavia's positive test for cocaine at birth and Alyse's failure to "achieve[] lasting sobriety." The court found clear and convincing evidence that Alyse had failed to remedy the conduct or conditions that placed Octavia at risk of harm. The court acknowledged that it was difficult for Alyse "to fully engage and address the issues that OCS is asking [a] person to address" while incarcerated, but it found that she "show[ed] a conscious and willful disregard of parental responsibilities toward the child by failing to participate" in the services to which she was referred. The court found that OCS made reasonable efforts to reunite Alyse and Octavia based on the services OCS offered both while Alyse was incarcerated and after her release. Finally, based on Octavia's need for permanency and the unlikelihood of "successful reunification . . . in any reasonable time frame," the court

found that terminating Alyse's parental rights was in Octavia's best interests. Alyse appeals.

## III. STANDARDS OF REVIEW

In a CINA case "we review the superior court's factual findings for clear error."[5] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[6] "[C]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[7] "Whether a child is in need of aid and whether the parent failed to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm are factual findings reviewed for clear error."[8] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact. We review questions of law de novo. 'We bear in mind at all times that terminating parental rights is a drastic measure.' "[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Its Reasonable Efforts Finding.

Before terminating parental rights the superior court must find that OCS

---

[5] *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[6] *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[7] *Id.* (quoting *Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[8] *Sherman B.*, 290 P.3d at 428 (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[9] *Id.* (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

made timely, reasonable efforts to provide family support services to help the parents remedy their problematic conduct.[10] "These efforts must include '(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid' and '(2) actively offer[ing] the parent . . . and refer[ring] the parent' to these services. "[11] "In reviewing whether OCS made reasonable efforts, a court considers the state's reunification efforts in their entirety. The court must first identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[12] In determining whether OCS made reasonable efforts "a court may consider 'a parent's demonstrated lack of willingness to participate in treatment' "[13] as well as a parent's incarceration.[14]

As part of reasonable efforts, AS 47.10.080(p) requires OCS to "provide reasonable visitation between the child and the child's parents" and states that visitation may be denied only "if there is clear and convincing evidence that visits are not in the child's best interests." If visitation is denied, the statute requires OCS to "inform the

---

[10] AS 47.10.086(a); 47.10.088(a)(3).

[11] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s. Servs.*, 382 P.3d 1154, 1164-65 (Alaska 2016) (alteration in original) (quoting AS 47.10.088(a)(1)-(2)).

[12] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[13] *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 850 (Alaska 2014) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[14] *See Barbara P.*, 234 P.3d at 1262 ("[T]he scope of OCS's duty to make reasonable efforts is affected by a parents incarceration.").

parent . . . of a reason for the denial and of the parent's . . . right to request a review hearing."

Citing AS 47.10.080(p), Alyse argues that OCS's efforts to reunify her and Octavia were not reasonable because OCS made little effort to facilitate visitation, "failed to inform her of a reason for the denial of her visitation rights[,] . . . and failed to inform [her] of her right to request a review hearing of the denial of her visitation rights." Alyse asserts that OCS's failures with regard to visitation caused her to stop communicating with OCS and thus "le[]d directly to the termination of [her] parental right[s]." Alyse compares her case to *Jerome S. v. State, Department of Health and Social Services, Office of Children's Services*, in which we concluded that OCS's "minimal" efforts to facilitate visitation between an incarcerated father and his son warranted reversal of the court's termination order.[15]

But this case is distinguishable from *Jerome S.* First, that case involved an Indian child, and OCS's statutory duty was to provide active, not just reasonable, efforts to reunify the family.[16] Second, in *Jerome S.* we emphasized OCS's "lack of meaningful communication" with the father[17] — something Alyse does not allege here, where the record shows that the two caseworkers maintained fairly regular contact. Lastly, in *Jerome S.* we noted that "OCS did not explain" its failure to facilitate visitation and

---

[15] No. S-18084, 2022 WL 1022032, at *2, 4, 6 (Alaska Apr. 6, 2022).

[16] *Id*. at *4. The active efforts standard required by ICWA is "more stringent" than the reasonable efforts standard applicable to CINA cases generally. *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 n.13 (Alaska 2021); *see* AS 47.10.086(a) (explaining reasonable efforts standard).

[17] *Jerome S.*, 2022 WL 1022032, at *4.

"presented no evidence that [the father's] incarceration prevented visitation altogether."[18] Here, on the other hand, OCS explained the obstacles to visitation: the nature of the charges against Alyse meant that DOC and the federal authorities restricted her contact with children, and for much of the time she was incarcerated she was in punitive segregation.

Alyse's case is more comparable to *Barbara P. v. State, Department of Health and Social Services, Office of Children's Services*, in which we upheld the superior court's finding that OCS made reasonable efforts to reunify a father (the mother Barbara P.'s co-appellant) and his children despite finding that OCS made "absolutely no effort to provide visitation to [the father] while he was incarcerated."[19] We acknowledged that "the scope of OCS's duty to make reasonable efforts is affected by a parent's incarceration."[20] However, viewing "OCS's reunification efforts in their entirety," we concluded that notwithstanding OCS's failure to facilitate visitation, it had satisfied the reasonable efforts standard by developing a number of case plans for the father and making referrals for a variety of services that he did not complete.[21]

As in *Barbara P.*, even if we were to conclude that OCS failed to provide reasonable visitation, we would still affirm the superior court's finding that OCS's efforts as a whole were reasonable. OCS developed a series of case plans for Alyse that addressed the issues that led to Octavia's removal; made referrals to services and classes while she was incarcerated; contacted her often to discuss her progress; and made referrals for a variety of other services once she was released, none of which she

---

[18] *Id*.

[19] 234 P.3d 1245, 1261-63 (Alaska 2010). *Id*.

[20] *Id*. at 1262.

[21] *Id*. at 1262-63.

completed. After her release OCS facilitated several video visits and one in-person visit before it lost contact with her. And the denial of visitation that prompted Alyse to drop out of contact was not OCS's decision, but rather that of her federal probation officer. The superior court did not err in finding that OCS's efforts were reasonable.

**B.      The Superior Court Did Not Err In Its Failure To Remedy Finding.**

"To terminate parental rights, the superior court must find by clear and convincing evidence that the parent has not remedied, within a reasonable period of time, the conduct that placed the child at substantial risk of harm."[22]   In making this determination, "the court may consider any fact relating to the best interests of the child."[23]

Alyse argues that she "was taking reasonable steps to remedy the conduct that had placed [Octavia] at risk" and the superior court "mischaracterize[d] [her] efforts." She emphasizes her continuous contact and engagement with her caseworker while incarcerated and, following her release, her participation in a substance abuse assessment and video visits with Octavia. Alyse also challenges the superior court's conclusion that she failed to achieve long-lasting sobriety, noting that the only evidence of her continued drug use was testimony about a positive marijuana test. She argues that it is "unfair to characterize the occasional use of marijuana" as something that would impair her ability to parent.

Although there is evidence that Alyse was initially committed to working with OCS and made meaningful steps toward reunification, the relevant inquiry is not whether she made progress, it is whether she *remedied* the conduct or conditions that

---

[22]      *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788-89 (Alaska 2019).

[23]      *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 902 (Alaska 2003).

placed Octavia at risk of harm.  Setting aside the evidence of Alyse's marijuana use, the record still supports a conclusion that she failed to engage with her case plan after she was released from custody and eventually stopped communicating with OCS altogether. This evidence is sufficient to support the finding that Alyse failed to remedy the conduct that placed Octavia at risk of harm.

### C.    Alyse Fails To Show The Prejudice Necessary To An Ineffective Assistance Of Counsel Claim.

Finally, Alyse argues that she received ineffective assistance of counsel because her "first attorney, Paul Tony, was nearly non-participatory in the court proceedings and . . . failed to make meaningful contact with [her]," and her second attorney, Mackin, "made no efforts [to] formally alert the court that [Tony's shortcomings] constituted a due process issue."  Alyse also argues that Mackin should have objected to OCS's denial of visitation and to some of the superior court's factual findings, particularly that Alyse did not maintain contact with OCS or complete the services to which she was referred.

"A parent has a due process right to effective counsel in a termination of parental rights proceeding."[24]  To determine whether a parent has established a violation of that right, we apply a two-pronged test.[25]  First, "the litigant must show that her attorney's performance was below a level that any reasonably competent attorney would provide," and second, "the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case.  It is not necessary to address

---

[24]     *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1265 (Alaska 2014).

[25]     *Id.*

the first prong of the test when the litigant has not satisfied the second prong."[26]

Alyse has not shown how Tony's improved performance would have affected her case. We recognize that his performance was poor; he missed hearings, contributed to delay by failing to meet with his client, and was often unreachable by the court or Alyse. However, Tony's poor performance did not affect the issues the superior court found determinative: Alyse's failure to follow through on her case plans or to maintain contact with OCS after her release from custody. While we denounce the failure of representation shown by this record, Alyse has not persuaded us that it prejudiced her case.

Further, because Tony's representation did not prejudice Alyse, she was not prejudiced by Mackin's failure to make a due process claim based on that representation. Nor could Alyse be prejudiced by Mackin's failure to object to specific factual findings that were not clearly erroneous.[27]

Mackin's failure to seek judicial review of OCS's cancellation of in-person visitation gives us more pause (though we cannot say what effect an objection would have had given Alyse's probation officer's position on the matter). But even if Mackin had successfully objected, Alyse does not demonstrate any likelihood that additional in-person visitation would have affected the outcome of her case. She still would not have had time to remedy the other, more significant issues the superior court found determinative. By August 2021, when it appears that Mackin learned of the visitation

---

[26] *Id.*

[27] The superior court did err in stating that Alyse never completed a substance abuse assessment. But because Alyse never completed any substance abuse treatment, the court's broader conclusion that she failed to complete the services outlined in her case plan is still accurate, and its mistake about the assessment is harmless.

issue and was invited to file an objection, Alyse had failed to start any substance abuse treatment, had allegedly left her job after ten days, and had fallen out of communication with OCS and her probation officer.  It was these factors, not the lack of visitation, that were most relevant to the court's termination decision.[28]  Because Alyse has not shown she was prejudiced by her attorneys' alleged failures, she does not have a viable claim of ineffective assistance of counsel.

## V.    CONCLUSION

We AFFIRM the superior court order terminating Alyse's parental rights.

---

[28]    The court itself acknowledged that the denied visitation was "unfortunate" and that "[t]here was not an attorney engaged at that point enough to the level of seeking some sort of review of that decision not to provide in-person visits based on what the [federal probation officer was] doing," but it still concluded that Octavia remained a child in need of aid, that OCS had made reasonable efforts, and that Alyse had failed to remedy the conduct that placed Octavia at risk of harm.